## CORRIGAN TRANSP. CO. v. SANITARY DISTRICT.

### (District Court, N. D. Illinois, N. D. October 13, 1903.)

### No. 9,457.

1. NAVIGABLE STREAMS—OBSTRUCTION OF NAVIGATION BY CREATING CURRENT IN CHICAGO RIVER—LIABILITY OF SANITARY DISTRICT.

> The sanitary district of Chicago, having been authorized by the state, and by the United States government through the Secretary of War, to construct the drainage canal and connect the same with the Chicago river, its use of the river for that purpose is lawful, and it cannot be held liable for damages resulting therefrom so long as such use is reasonable and within the authority conferred. The provision in the permit granted by the Secretary of War that the district must assume all responsibility for damages to property and navigation interests by reason of the introduction of a current in the river does not create a liability, but merely undertakes to impose on the district such liability as may legally arise; and the creation of a mean current throughout the length of the river of 1¼ miles an hour, which at congested points, such as bridge draws, is augmented, and operates to obstruct or retard the passage of vessels, especially those of large displacement, is not an unreasonable or unauthorized use of the river, which renders the district liable to a vessel for the additional expense and delay resulting, in the absence of any exercise by the secretary of the power reserved by him to regulate the current should it prove unreasonably obstructive.

In Admiralty. Suit to recover damages for obstructing navigation of the Chicago river.

Harvey D. Gaulder and C. W. Greenfield, for libelant.

Seymour Jones, for respondent.

KOHLSAAT, District Judge. Libelant seeks to hold the respondent for damages alleged to have been incurred in towing the barge Algeria from Elevator C, on the Chicago river, west of Halsted street, to a point near the mouth of the river, by reason of the current created by respondent's canal or drainage channel. The barge is 288 feet long, has 44.6 feet beam, and draws, when loaded, 16½ feet of water. Libelant claims: (1) The barge was delayed about 12 hours; (2) that she incurred an extra expense of tug hire of $328; and (3) that she sustained damage by the straining of lines and timber heads.

The above items, it is insisted, were all caused by the greatly increased rapidity of the current. Owing to this cause the tugs were unwilling to start with the barge until daylight on October 5, 1900. She started down the river about 5 o'clock in the morning in charge of two tugs—one forward and the other at her stern. These, it is claimed, would have been adequate in a current not exceeding 1¼ miles per hour. In passing through the Halsted street draw a third tug was engaged—two forward and one astern. She was half an hour in clearing the bridge draw. The same trouble was repeated at each draw from Twenty-Second street to Washington street. There a fourth tug was procured, and the trip down the river was finally concluded. While the current offered considerable resistance all the way down, the greatest current was encountered at the bridges by reason of the conjested channel at such point and the obstruction caused by the barge herself.

Libelant insists that respondent is liable for any damage caused by its acts in increasing the current, claiming incidentally that the increase was largely in excess of the 1¼ miles per hour alleged to be contemplated by the Secretary of War. Respondent, on the other hand, claims that its acts in respect to an increase of the current were under the control of the government of the United States, that it was acting under the permit of the Secretary of War, and that it committed no illegal act in accelerating the river current.

By Act Cong. March 3, 1899, c. 425, § 10, 30 Stat. 1151 [U. S. Comp. St. 1901, p. 3541], it was provided that it should be unlawful to modify the condition or capacity of the channel of any navigable water of the United States, "unless the work has been recommended by the chief of engineers and authorized by the Secretary of War prior to the beginning the same." This act covers the Chicago river. The respondent was organized in 1890, under the act of July 1, 1889 (Laws 1889, p. 125), in reference thereto, passed by the Legislature of Illinois, in which state the Chicago river is wholly situated. The district was by said act authorized to construct a drainage channel of sufficient size and capacity to produce and maintain a flow of water of 300,000 cubic feet per minute, and a current of not exceeding three miles per hour. Provision was also made for the increase of flowage, in the event of a greater population, without an increase of speed of current.

In pursuance of and conformity to the above act, respondent proceeded to and did construct a drainage channel from Robey street, in the city of Chicago, in said state, to Lockport, Ill., a distance of about 28 miles; it being the intention to use the Chicago river from Robey street to Lake Michigan as a connection between said channel and the lake. On June 16, 1896, the respondent, by its president, made application to the Secretary of War for permission to make such improvements and changes in the Chicago river as would meet the requirements of the said channel and the law under which it was constructed, and submitted therewith a map of the proposed changes. On the recommendation of the government engineer, the Secretary of War granted a qualified permission on certain conditions. Clause 2 of this permission provided that the authority granted should "not be interpreted as an approval of the plans of the sanitary district of Chicago to introduce a current into Chicago river. This latter proposition must hereafter be submitted for consideration." Clause 4 provided "that the United States will not be put to expense by reason of this work." The other clauses are not pertinent here. Afterwards more complete plans were furnished by respondent, whereupon, on November 16, 1897, upon the recommendation of the government engineer, the Secretary of War approved the same, and granted a permit, subject to the same conditions as above set out.

Some time prior to April 24, 1899, application was duly made to the Secretary of War for leave to connect the said drainage channel with the Chicago river at the south branch thereof at said Robey street. This was referred to the chief government engineer. On May 8, 1899, the Secretary of War granted permission to respondent to make such connection, subject to certain reservations, to wit:

(1) That the matter should be submitted to Congress, and the permit should abide its action there; (2) that, if at any time the current should be found to be unreasonably obstructive to navigation or injurious to property, the right was reserved to close or modify the discharge through said channel to such an extent as may be demanded by navigation and property interests along said Chicago river and its South branch; (3) that respondent must assume all responsibility for damages to property and navigation interests by reason of the introduction of a current in Chicago river. In January, 1900, the connection was made, since which time the water from the river and lake have flowed into the drainage channel. The current resulting from this flow is alleged by libelant to be the primary cause of the damage complained of.

It is evident that, should the theory of libelant prevail, it would make respondent liable for any and all damages arising from the increased current, no matter how slight the increase. Not only navigation interests, but abutting property interests, would be in position to make claims for damages growing out of any increase in current. The matters involved herein are therefore of very grave importance. The evidence as to the rate of speed of the current is uncertain. It would seem to be fairly established by respondent's witnesses that the average or mean rate of speed along the whole line of the river does not exceed 1¼ miles per hour, as a result of a flow of 300,000 cubic feet per minute. But at all congested points, such as bridge draws and other narrow points, it is much greater, and when augmented by the displacement and resistance of vessels this speed is further increased.

It would seem from the evidence that an average speed of even one-half a mile per hour would in such circumstances exceed 1¼ miles per hour. The only theory upon which this rate of speed, i. e., 1¼ miles per hour, is involved in this case, is that respondent in its application for leave to make changes in the river says: "It is desired to so correct and regularize the cross-section of the river as to secure a flowage capacity of 300,000 cubic feet per minute, with a velocity of one and one-quarter miles per hour;" and the recital in the engineer's recommendation to the Secretary of War, that the respondent's engineer estimates the mean current, with 300,000 gallons per minute, to be 1¼ miles per hour, which estimate he declares to be simply an assumption based on an unobstructed flow, together with the recital in the preamble to the final permit of the Secretary of War, granting authority to connect the river and the channel, to the effect that the Secretary of War has heretofore granted respondent permission to make improvements in the river "for the purpose of connecting and regulating the cross-section of the river so as to secure a flowage of 300,000 cubic feet per minute, with a velocity of 1¼ miles an hour." It will be seen from above that the Secretary of War does not in any manner undertake to fix the rate of speed of the current, or the amount of flowage, but simply reserves the right to regulate the same as experience may make desirable. The clause of the final permit above quoted requiring the respondent to assume all responsibility for damages in the premises

cannot be construed as meaning more than that, that whatever damages may legally arise are to be assumed by respondent. It does not create any liability, but would seem to have been inserted as an extra precaution. The Secretary of War could neither create nor wipe out a legal cause of action. The liability referred to is a "legal liability," springing out of the acts of respondent, existing, if at all, entirely independent of said clause. The issue, then, must be narrowed down to the single proposition: "Is the sanitary district of Chicago liable for damages growing out of its manipulation of the Chicago river, such acts being done with the consent of the federal government and the state of Illinois?"

A number of cases have been cited holding that a party obstructing navigable waters is liable for damages resulting therefrom, but in each of such cases the obstruction was an illegal one; that is, not done under authority of the government. In the case at bar there was no illegal act on the part of respondent. The improvement was lawfully made. Had Congress not legislated with regard to the Chicago river, the state would have the power to direct and control it to the extent of closing it. Congress has, however, so legislated, but has, through its proper officer, released to a degree something of its control. To the extent of such release may it not be said that the state is reinvested with control. The act creating respondent (Laws 1889, p. 125) by section 7 provides that the trustees of a sanitary district shall have power to provide for the drainage of such district by laying out, etc., one or more channels, etc., for carrying off and disposing of the drainage, etc., "together with such adjuncts and additions thereto as may be necessary or proper to cause such channels or outlets to accomplish the end for which they are designed." It provides for the drawing of water from lake Michigan, and in section 27 enacts that, if any such channel "receives its supply of water from any river or channel connecting with lake Michigan, it shall be construed as receiving its supply of water from Lake Michigan." It would seem then that so far as the state had the power it authorized the respondent to use the Chicago river. Can it be claimed that the government had not the power to permit such a use of the river as to it should seem reasonable, reserving the right to regulate that use as it deemed consistent with the rights of navigation and property owners? Has the general government not the power to so reconstruct or change navigable streams as it may deem best for the public use? Certainly, if it has, it can permit others to do so. The drainage channel is a vast public improvement. The government has recognized it as such, and permitted a reasonable use of the Chicago river in connection with it. It has reserved the power to control the flow of water. This power it may exercise at any time.

Whether or not it is within the power of the government to arbitrarily permit the increase of the current in a navigable river to such an extent as to make navigation thereon more tedious and expensive, it must be conceded that the welfare of several millions of its citizens is a consideration which might well be pleaded as a sufficient ground for a reasonable modification of the existing current. Were it either necessary or desirable to find other consideration, it

may be found in the act of incorporation itself, wherein it is provided that when the channel is completed, and 300,000 cubic feet of water per minute turned therein, the same is declared to be a navigable stream, and that, whenever the general government improves the Des Plaines river for navigation to connect with this channel, said general government shall have full control over the channel, subject to the right of the district for drainage purposes. It may well be assumed that the government, through its proper officers, had this in mind.

My conclusion upon the matter is this: By permission of the general government the respondent connected the channel with the South branch of Chicago river. Such permission was withheld until certain requirements were complied with. Respondent took all necessary legal steps, and acted within the permit. Whatever damage accrued to libelant grew out of the congestion of the channel by reason of the bridge piers or abutments which were not under its contract. There is no undertaking with navigators, express or implied, that the current of the river shall not exceed a certain rate of speed, except the three-mile provision of the act creating the district. The damage complained of would not have accrued to a smaller vessel. It was the resistance of the current as augmented by the narrow draw and the great bulk of the vessel, the latter being such as to practically fill the draw and stop the flow beyond the bow. These three causes combined brought about the damage claimed. Was the additional current an unreasonable use of the permission given by the government? I think not. It was also a reasonable exercise of the power vested in the Secretary of War. I find no adjudicated case dealing with the rights of navigators with reference to difficulties of navigation caused by increased speed of currents resulting from acts approved by the proper government officers.

In the case of Cummings v. Chicago, 188 U. S. 410–431, 23 Sup. Ct. 472, 47 L. Ed. 525, Justice Harlan lays down certain general principles affecting the relative powers of the United States and of the state with reference to navigable waters, which, while not bearing directly upon the facts of this case, would seem to indicate that it was not the purpose of the act of 1890 to deprive the state within whose limits the navigable water is wholly situated of all reasonable control for local purposes.

On general principles, however, the rights of navigators must be held to be subject to the exercise of such power by the government. The most that can be said for libelant is that it has made out a case of damnum obsque injuria.

The libel is dismissed.