155 So. 601

**ALABAMA POWER CO. v. SMITH et al.**

6 Div. 339.

Supreme Court of Alabama.

May 10, 1934.

Rehearing Denied June 28, 1934.

106

Martin, Turner & McWhorter and Walter
Bouldin, all of Birmingham, for appellant.

Coleman, Spain, Stewart & Davies, of Birmingham, and Rushton, Crenshaw & Rushton, of Montgomery, for appellees.

GARDNER, Justice.

Plaintiffs, under a contract with the state, began, in March, 1929, the construction of a bridge across the navigable Coosa river, at Wetumpka, previously authorized by Congress, and the location and plans for which had been approved by the Secretary of War.

Defendant at the same time owned and operated what is known as Jordan Dam, for the operation of a hydroelectric plant, across said river at a point some 7 or 8 miles above the bridge site. This dam (plans and specifications for which had been approved by the Secretary of War) had been constructed and was operated in 1928 by authority of a certificate of convenience from the Public Service Commission of Alabama, and a license issued by the Federal Power Commission, under the terms of what is known as the Federal Water Power Act. 16 USCA, chapter 12 (section 791 et seq.).

On September 20, 1929, plaintiffs had practically completed the piers for the bridge, with the exception of pier No. 6, which presented the greater difficulty, as it was to be located near the center of the channel of the river, about 200 feet in width at that point, and more or less precipitous on account of a drop of several feet in a distance of a thousand yards above the bridge's location. The erection of the pier necessitated the construction of a cofferdam, which in turn must be protected by a "breakwater," consisting of five cribs built of pine poles, spiked together, and filled with rock. This breakwater was practically complete, and the incomplete cofferdam was anchored thereto by cables. Plaintiffs' testimony tended to show

that on the morning of September 20, 1929, there was a very rapid rise in the channel of the river, which washed away one of the cribs, turned over another, and partially destroyed a third; the cofferdam was destroyed, the barge sunk and lost together with the tools and equipment thereon.

As to the matter of damages, plaintiffs testified that the overturning of the cribs so strewed the loose rock over the area where the cofferdam was to be placed as to render it practically impossible to construct a cofferdam of the type originally contemplated, and rendered necessary the building of two smaller cofferdams, one for each footing of the pier, with narrowed retaining walls, sealed with cement; that the wreckage made it impossible to complete the pier during the working season of 1929, and the completion of the job was delayed seventeen months; and that additional equipment, material, and labor was required.

Plaintiffs further testified, over defendant's objection, that the estimated cost of the bridge at the time of the execution of their contract, was $155,000, which was a reasonable cost, and that the actual cost of the bridge was $331,000, which also was reasonable, and nothing except the accident increased the cost. There was judgment for the plaintiffs in the sum of $185,387, from which defendant prosecutes this appeal.

■ This brief outline will suffice to show that both plaintiffs and defendant were lawfully in the use of this navigable stream, the right to the use of which as highways has been held analogous to the use of highways on land and governed by like principles. As said in Harold v. Jones, 86 Ala. 274, 5 So. 438, 439, 3 L. R. A. 406: "Any and all of the public have an equal right to the reasonable use of a highway. * * * No precise definition of what constitutes a reasonable use, adapted to all cases, can be laid down. Whether or not any particular use is reasonable depends on the character of the highway, its location, and purposes, and the necessity, extent, and duration of the use, under all the attendant and surrounding circumstances. * * * It must not be incompatible with the reasonable free use of others, who may have occasion to travel or transport over it, and the obstruction must not be continued longer than the continuance of the necessity, and a reasonable time for its removal. * * * The same principles are applicable, and regulate the use of watercourses as highways." The right of a license is therefore a qualified, and not an

absolute right of property. Ulbricht v. Eufaula Water Co., 86 Ala. 587, 6 So. 78, 4 L. R. A. 572, 11 Am. St. Rep. 72.

Defendant's power plant was constructed under state and federal sanction, and the plans and specifications therefor approved by the federal authorities. It had a capacity for what is referred to as a 10-10 load, and we do not understand that it is appellees' contention that the mere operation of the plant at full capacity alone and of itself would constitute negligence. It would seem that our cases of Hamilton v. Alabama Power Co., 195 Ala. 438, 70 So. 737, and Burnett v. Alabama Power Co., 199 Ala. 337, 74 So. 459, would be a sufficient answer to any such contention.

■ True the exact provision in the Federal Water Power Act, § 10(c), 16 USCA § 803 (c), to the effect that the "licensee hereunder shall be liable for all damages occasioned to the property of others by the construction, maintenance, or operation of the project works or of the works appurtenant or accessory thereto, constructed under the license, and in no event shall the United States be liable therefor," was not involved in the above-noted cases, though a somewhat similar provision was embraced in the statute under which the dam there referred to was constructed. 34 U. S. Stat. at Large, c. 2912, p. 1288.

We are of the opinion the above-noted provision was not intended to create any liability, but was inserted more as a matter of precaution, and to the end that whatever damages may legally arise are to be assumed by the licensee. Corrigan Transp. Co. v. Sanitary District (D. C.) 125 F. 611. And we find nothing in the cases of Ford & Son v. Little Falls Fibre Co., 280 U. S., 369, 50 S. Ct. 140, 74 L. Ed. 483; Taylor v. Indiana & Michigan Elec. Co., 184 Mich. 578, 151 N. W. 739, L. R. A. 1915E, 294; Levin v. Philadelphia Elec. Power Co. (D. C.) 34 F.(2d) 224; and Wine v. Northern Pac. R. Co., 48 Mont. 200, 136 P. 387, 49 L. R. A. (N. S.) 711, Ann. Cas. 1915D, 1102, that in any manner conflicts with these views. And in the Hamilton and Burnett Cases, supra, the opinions disclose a liability for negligence; but the effect of the holding was that the mere execution by the licensee of that specifically authorized by law, could not of itself be made the ground of liability as for negligent conduct.

Speaking to the provision in the Federal Water Power Act, found in 16 USCA § 803 (c), counsel for appellee in reply brief say:

"We have never urged that these provisions imposed any liability on appellant. We simply insist that the granting of the permit conferred no immunity." This, likewise, is our view, and that the law is now, as it was when the Hamilton and Burnett Cases, supra, were decided, that liability follows from proven negligence, and against such liability the permit and license for construction and operation intended no immunity.

■ It is settled by our decisions that one who constructs a dam in a navigable stream is not an insurer against damages to lower owners, even when such damages are caused by the breaking of the dam. Some element of negligent conduct must appear. Sloss-Sheffield S. & I. Co. v. Wilson, 183 Ala. 411, 62 So. 802.

■ The trial court so recognized this principle in charges given for defendant, as well as also the rule that a licensee in the regular operation of its plant was under no duty to exercise diligence to ascertain whether such operation would be attended with peril, unless and until there was something to put it on notice to that effect. Southern R. Co. v. Dickson, 211 Ala. 481, 100 So. 665; Alabama Power Co. v. Shaw, 215 Ala. 436, 111 So. 17.

■ Measured by these rules, we think count A3 not subject to the demurrer interposed thereto. The count discloses notice to defendant of plaintiffs' construction of the cofferdam in the channel of the river, its control of the water, and that it knew, or by the exercise of reasonable diligence, would have known, that the release of any unusually large quantity of water through Jordan Dam would likely or probably result in great damage to plaintiffs' bridge building operations. It is then charged that defendant negligently caused an unusually and unreasonably large quantity of water to be released from and through its said dam.

Appellant argues that the use of the word "unreasonably" adds nothing to the count, as it is but a mere conclusion. But we think, as argued by appellees, that the words "reasonable use" in the law of waters have acquired a well-defined significance (North Ala. C., I. & R. Co. v. Jones, 156 Ala. 367, 47 So. 144; Stein v. Burden, 29 Ala. 127, 65 Am. Dec. 394; 27 R. C. L. 1084; Farnham on Water & Water Rights, vol. 2, p. 619), and carries to the defendant sufficient information of plaintiffs' claim.

Under the facts as stated in the count the averments in this respect suffice for all practical purposes, and contain no element of surprise.

The complaints in Mauldin v. Cent. of Georgia R. Co., 181 Ala. 591, 61 So. 947, and Worthington v. Davis, 208 Ala. 600, 94 So. 806, were materially different from the count here considered, and do not, in our opinion, militate against the conclusion reached as to said count. Illustrative is the Mauldin Case, where the opinion discloses that the complaint showed no duty resting upon the defendant, a negligent breach of which was the foundation of plaintiff's case.

Count A3 shows a duty on defendant, and sufficiently charges a negligent breach thereof. Birmingham O. & M. Co. v. Grover, 159 Ala. 276, 48 So. 682. The demurrer to this count was properly overruled.

■ Nor are we persuaded defendant was due the affirmative charge as to count A3. True, the operation of defendant's plant at full capacity was lawful, but, as said in 45 Corpus Juris 637, "it is not necessary to constitute actionable negligence, that the act or omission complained of should have involved any element of illegality."

Plaintiffs' evidence tended to show that the quantity of water released between 8 and 9 o'clock of the morning of September 20, 1929, was unusual, and unreasonable; that the usual operation, as they were given to understand by those in control of the operations, was for a 7-10 load, and notice of anything unusual would be given them. They likewise offered proof tending to show that it was unnecessary and unreasonable.

From purely a standpoint of efficient operation, the order for a full capacity operation at Jordan Dam was justifiable. On the Tallapoosa river defendant owned Martin Dam, which had a large storage capacity, below which were two other dams, upon one of which work was in progress. There was a 3-foot rise at Childersburg, above Jordan Dam, and which would reach there in a day or so. It was therefore proper economy to make use of the water in Jordan Dam, and make a place for the water on its way down from Childersburg. Over a certain quantity current from Wilson Dam entails additional cost. Water must be stored to meet any requirements of the federal authorities as to a 6,000-foot stage at the Alabama river, and, also, for the generation of current as the demand increases. It was therefore economical to take less current from Wilson Dam, and cut down that at Martin Dam, where the storage capacity is large, and place the major portion of the load at Jordan Dam, thus conserving the water on its way down.

There is proof tending to show, however, that the order for the 10-10 load at Jordan Dam was for economical use of the water for the protection of electrical energy, and not to meet any requirements as to the stage of the river at Montgomery. But this matter of efficient operation of the plant leaves plaintiffs and their rights in the Coosa river out of consideration.

There was evidence tending to show that normally water from the Tallapoosa as it flows into the Coosa causes back water to come as far as the bridge site, and that less than a normal flow in the Tallapoosa would of consequence increase the velocity of the waters of the Coosa.

Plaintiffs' proof was further to the effect that it was the sudden release of the water, and its velocity that produced the wreckage, and that the water on the morning of September 20th came down in a rush at the bridge site, "a wave" according to one witness, "five feet in height," though upon the extent of the rise there is a difference of view among the witnesses. Defendant's proof tended to show that the automatic gauge ½ mile below the dam showed a rise of the river on that morning, between 8 and 9 o'clock, of $1\frac{1}{10}$ feet, though at that locality the river is 1,000 feet wide.

Previous to beginning work on the construction of pier 6, plaintiff Carroll Smith interviewed Cox, superintendent in charge of Jordan Dam, on the matter of co-operation on defendant's part, and, likewise, talked with Eberhardt, assistant to Hawkins, chief hydraulic engineer at Magella, and upon whose orders the loads to the various plants of defendant were allocated. They each readily agreed to co-operate, and gave some explanation as to the various operations of the plants, and that little could be done in the way of control of high flows. Smith testified that in the conversation with Eberhardt, the latter told him that a 7-10 was a normal load, and as to any abnormal condition he would give information by telephone. This Eberhardt denied. Co-operation was given, plaintiffs insist, except as to this one occasion, when for the first time after these conversations the order for a full capacity operation of Jordan Dam plant was given without previous notice.

Orders for plant operations are issued out of Magella each morning after a consideration of load requirements, river conditions, and the like, all looking to a more efficient and economical operation of the entire system.

The effect of the order issued on the morning of September 20th was to place the larger portion of the day's output upon the Coosa river dams (87 per cent. as compared with 7-10 of 1 per cent. from the Tallapoosa river dam), and at the same time lessening the flow of the Tallapoosa, and thus removing from plaintiffs' structures the support of the back waters, creating greater velocity at the bridge site. The order was received by Gamble at the Jordan Dam plant, and by him executed, eleven minutes being required to reach a full capacity operation; and plaintiffs had no knowledge or notice of this extra amount of water until Adams, in plaintiffs' employ, about 8 o'clock of the morning of the 20th, was notified over the telephone by Cox that the order was for a 10-10 load that day.

Adams was allowed, over defendant's objection, to testify that Cox's voice sounded excited, and in support of the objection reliance is had upon Cohn & Goldberg Lumber Co. v. Robbins, 159 Ala. 289, 48 So. 853. But that case involved merely the question of the mental status of another, and is distinguishable. We are persuaded the court's ruling finds support in the following of our authorities: Jones v. Keith, 223 Ala. 36, 134 So. 630; Hodge v. Rambo, 155 Ala. 175, 45 So. 678; Southern Natural Gas Co. v. Davidson, 225 Ala. 171, 142 So. 63; Long v. Seigel, 177 Ala. 338, 58 So. 380.

Nor is it any answer to say that the previous information of Cox and Eberhardt was acquired outside the line of their duties, as insisted by defendant (Whelan v. McCreary, 64 Ala. 319; Central of Ga. Ry. Co. v. Joseph, 125 Ala. 313, 28 So. 35), as the one (Cox) was superintendent at Jordan Dam, and the other assistant to the chief hydraulic engineer, and, as such, interested not only in the efficient operation of the plants from an economical standpoint, but, also, in their reasonable operation as well as affecting plaintiffs who were, with their knowledge, rightfully in the same river with defendant.

Continuing with the testimony, it appears that Carroll Smith immediately got Cox on the telephone, to ascertain the amount of water that might be expected as compared to previous days, and being informed of the greatly increased amount, expressed the opinion that such quantity of water would ruin them, and wanted to know if getting the Birmingham office would be of any help. To this suggestion, Cox replied that it was too late, the water was on its way.

Plaintiffs' evidence further tended to show that had sufficient notice been given, prepara-

tion could have been made and the disastrous effect prevented.

In considering the evidence upon the question of the general affirmative charge, it should also be borne in mind that defendant was in control of the water, both in the Coosa and Tallapoosa rivers, and there was no question of flood conditions. No water went over the spillway, but all was utilized.

Plaintiffs' proof, as above very generally outlined, was sufficient for submission to the jury as to whether or not the operation of the plant was both unusual and unreasonable, and whether defendant was guilty of negligence in failing to give sufficient notice, or in failing to ascertain previous to the order for full capacity, whether or not such operation would result in damage to the plaintiffs.

There is no occasion to discuss defendant's proof in rebuttal that the operation was usual and reasonable, and no sudden rise, all of which merely served for a submission under the general issue of the question of defendant's negligence.

Defendant also offered proof tending to show that plaintiffs should have so constructed their breakwater and cofferdam as to withstand any such rise in the river, and that the work was not properly done, as well as some incompetence in their foreman. But there is no need for a detail consideration of this proof, further than to state it sufficed for submission to the jury of defendant's plea of contributory negligence.

We conclude, therefore, the affirmative charge as to count A3 was properly refused.

The court admitted, over defendant's objection, the declarations of Hawkins to Carroll Smith on the day following the accident, and in answer to the latter's inquiry concerning it, as follows: "We had three inches of rain in Rome, Georgia, and we were emptying the lake at Jordan Dam to make a hole for that water which would get there later." Hawkins was the chief hydraulic engineer in defendant's employ. The admitted declaration was by an agent as to a bygone transaction. In the recent case of Arlington Realty Co. v. Lawson (Ala. Sup.) 153 So. 425, 427,[1] many of our authorities are collected, disclosing such declarations of an agent of past transactions "are wholly without the line and scope of employment, and have been uniformly held inadmissible." And the more recent case of Birmingham News Co. v. Browne (Ala. Sup.) 153 So. 889,[2] is to like effect. Atlas Portland Cement Co. v. Sharpe, 209 Ala. 464, 96

So. 632, cited in the first above-noted case, is doubtless more directly here in point. There was error in the admission of this proof. Authorities, supra. Nor was the ruling justified upon any theory that Hawkins was the alter ego of the defendant. He was merely in the defendant's employ as its chief engineer, and nothing more. We are unable also to find justification in defendant's answer to interrogatories introduced in evidence by plaintiffs.

We do not consider the authorities cited by appellees (Louisville & N. R. Co. v. Morgan, 95 Ala. 608, 10 So. 834; Standard Oil Co. v. Davis, 208 Ala. 565, 94 So. 754; Home Ice Factory v. Howells Mining Co., 157 Ala. 603, 48 So. 117; Hotel Tutwiler Operating Co. v. Evans, 208 Ala. 252, 94 So. 120; Woodlawn Infirmary v. Byers, 216 Ala. 210, 112 So. 831) contain anything contrary to the conclusion here reached.

Nor can we say its admission was harmless as being consistent with defendant's contention on the trial, which was to the effect the order for full capacity at Jordan Dam was justified by a rise in the river of freshet proportions, which had about reached the uppermost of defendant's three lakes, and presented therefore a present problem, and not one so remote as a rain in Rome, Ga. It is difficult to correctly analyze the probative force of this evidence, which was improperly admitted; but we are not persuaded of its harmless effect.

Construing count A5 as in tort, it nevertheless is made to rest upon a contract, to the effect that defendant "promised and undertook to give plaintiffs reasonable notice of the discharge of any unusually large flow of water through said Jordan Dam," and "plaintiffs relied upon said promise and undertaking." The basis for such a contract is the conversation had between Carroll Smith and Eberhardt, who was assistant to Hawkins, chief hydraulic engineer. It may be seriously questioned that Smith's testimony is sufficient to show that in fact any binding contract was contemplated by either himself or Eberhardt, but rather a friendly conversation and co-operation between the parties, each of whom was rightfully in the stream.

Eberhardt explained to him the load chart, and that this dam had no storage capacity, and water could not be controlled except for a short period of time; that at times when power is not demanded, it is shut off, thus lowering the water, and notice of this fact

---

[1] 228 Ala. 214.

[2] 228 Ala. 414.

114

would prove helpful. Smith recalled that in fact he was given two weeks' notice the dam would be closed on Labor Day, of which he took advantage. Eberhardt then said: "We will do anything to help, and, Mr. Smith, if it will do you any good, we will let you know by telephone of any unusual happenings." He explained in the load chart as to the usual flow and any unusual low or high water. "First, he said, high water, and I asked him to include low water, and let us take advantage of that low water any time we got notice of the good as well as the bad, absolutely, and he said he would. * * * He said he would let me know by telephone about abnormal conditions. Yes, certainly he volunteered, 'If it will help you in any way I will be glad to let you know.'"

Smith was asking for help on his work. There was no mention of any matter of consideration. He testified they were on the job thirty-one months, and got co-operation from Mr. Eberhardt and Mr. Cox every day of that time, except one. "They gave nice assistance nine hundred and twenty-nine of those days." And again, "But they did give me beautiful co-operation except this one particular time." When information two weeks in advance was given previous to Labor Day, that low water could be expected for two weeks, Smith says, "I had that two weeks' information furnished absolutely free, and it was of substantial benefit to me. It actually saved me money in construction."

If a binding promise was made, it was effectual as much for notice of low water as of high, and a right of action accrued for damages suffered by failure to give notice of the low water so that plaintiffs could take advantage of the situation, and make progress on the pier construction. All of which is to be considered in construing the conversation between these parties. And if what was said by Eberhardt was merely an expression of gratuitous interest and willingness on his part to co-operate, with no intention to enter into any unconditional and binding promise or agreement, then such a conversation could not be made the basis of liability against defendant. U. S. C. I. P. & F. Co. v. Fuller, 212 Ala. 177, 102 So. 25; Connors-Weyman Steel Co. v. Kilgore, 189 Ala. 643, 66 So. 609. And, as previously stated, whether what was said may be interpreted into a binding agreement, presents a question of much doubt, though the writer is inclined to the negative view.

██ ██ But that question aside and undetermined, the affirmative charge was due defendant on this count for a failure of the proof to show that any such undertaking was within the line and scope of Eberhardt's authority. Hawkins was merely the chief engineer. Neither he nor Eberhardt, his assistant, was called upon to deal in a contractual way with the general public, and there was nothing in the nature of their duties that imports authority to enter into such contracts.

Doubtless a case most nearly in point is that of Alexander v. Ala. Western R. Co., 179 Ala. 480, 60 So. 295. Among other authorities from this court leading to a like effect are: Barker v. Dairymen's Milk Products Co., 205 Ala. 470, 88 So. 588; Doran & Co. v. Gilreath, 196 Ala. 377, 72 So. 94; Coston-Riles Lumber Co. v. Alabama Machinery & Supply Co., 209 Ala. 151, 95 So. 577; Birmingham News Co. v. Birmingham Printing Co., 209 Ala. 403, 96 So. 336; Westbrook v. Kansas City, M. & B. R. Co., 170 Ala. 574, 54 So. 231, 34 L. R. A. (N. S.) 469.

Nor do we find anything in plaintiffs' suggestion of Hawkins' admission that he did write letters to manufacturers about equipment details, and to outside people who had transactions with the company as to matters concerning technical information. But all of this merely related to the usual and ordinary operations inherent in work of that character, and from which no reasonable inference could be drawn that he had authority to enter into any such binding agreement, as plaintiffs here insist. Nor does the fact that the safe and efficient operation of the electrical plants devolved upon them, tend to show any contractual authority. We are unable to find any support in the record that they were so permitted to conduct the business. The entry as to Pete Bidette, we interpret as for the defendant's benefit, the work then in progress being done for and on behalf of defendant. Nor does there appear any evidence of ratification of any such agreement.

While Eberhardt and Hawkins, as well as Cox, the superintendent at Jordan Dam, rendered co-operation to plaintiffs, as hereinbefore disclosed, yet there is nothing in the record tending to show that any official of defendant had any notice whatever of any alleged promise or undertaking, and without knowledge, there could be no ratification.

Plaintiffs' counsel place some reliance upon Lucas v. Walker, 22 Cal. App. 296, 134 P. 374, 375, 379, as establishing authority to make such an agreement. That case appears to have been rested upon a general charge of negligence, and while the holding was that the elevator boy, being under a duty to give a warning, did not exceed his authority in agreeing to do so, yet the case was not rested

upon the promise, which, as we read the case, was only incidental, and properly to be considered upon the question of negligence. The court refers approvingly to Beatty v. Metropolitan Building Co., 63 Wash. 207, 115 P. 90, 92, L. R. A. 1917E, 963, Ann. Cas. 1912D, 528. In that case, discussing a similar situation, the court said: "The negligence of the elevator man did not depend on the promise, nor consist in the breaking of it. His negligence was in so running the elevator that it injured a person not a trespasser whom he had reason to know would be likely to be injured by his so running it. The agreement or arrangement is proof that he had notice of the situation. * * * The boy's promise not to come below the second floor was not important, except to show this actual knowledge of appellant's presence in the shaft, and as tending to excuse appellant from the charge of contributory negligence."

Other authorities cited have been examined, but their discussion here would extend this opinion to undue length. We find nothing in any of them persuasive to our minds that the making of the agreement here relied upon came within the line and scope of these employees, but rather the contrary. But, as observed in the Beatty Case, supra, any such alleged promise is proper to be considered under the charge of negligence, and as proof that these employees had notice of the situation. To make it the basis of a cause of action is, however, an entirely different matter.

As we read defendant's answers to the interrogatories, they are in effect in conformity with the testimony of Eberhardt as to what was said, and nothing more.

Plaintiffs lay much stress upon the fact that they were also rightfully in the river. Defendant was therefore under the duty to use due care not to injure them by any negligent conduct on its part. Any duty that arises, however, is a duty imposed by law, and not by contract, and this duty existed entirely aside from any contract or agreement.

We conclude, therefore, that defendant's employees had no authority, express or implied, to enter into any such binding agreement, and that reversible error was committed in the refusal of the affirmative charge as to count A5.

 The trial court also submitted to the jury the wanton count A4, and the refusal of the affirmative charge as to this count is assigned and argued as error. There is no charge of intentional wrong, but this count rests upon the theory that defendant's employees were conscious from their knowledge of existing conditions that injury would likely or probably result to plaintiffs from their conduct, and with reckless indifference to consequences, and in reckless disregard of plaintiffs' rights, wantonly and recklessly discharged "said unusually and unreasonably large quantity of water at said time and place."

"To constitute wantonness it must be shown that the person (the motorman) was conscious of his conduct and conscious from his knowledge of existing conditions that injury would likely, or probably, result from his conduct, and that with reckless indifference to consequences he consciously and intentionally did some wrongful act or omitted some known duty, which produced the injurious result." Alabama Power Co. v. Gooch, 221 Ala. 325, 128 So. 793, 794; Daniel v. Motes, 228 Ala. 454, 153 So. 727.

The order for each day's operation of the different plants came from the Magella station under authority of Hawkins, and was determined early each morning after receiving reports as to weather and river conditions, and consideration given to power demands. The loads were then allocated, and on the morning of September 20th, Hawkins considering the rise at Childersburg, and having in mind the conservation of the water, and the most economical operation, directed the 10–10 load at Jordan Dam. He and those under his immediate supervision knew plaintiffs were building pier 6, and had directed Cox, the Jordan Dam superintendent, to co-operate with them. A 10–10 load was full capacity, and the evidence is to the effect that there had previously been several such operations at this dam, though none in August and September.

It is not contended by appellees, as we understand their argument, that the mere operation of the dam at full capacity was in and of itself wrongful, but that it was the sudden, and to them unprecedented, unnecessary, and unreasonable release of the water at Jordan Dam, at a time when the flow of the Tallapoosa had been lowered, resulting in the loss of any back water at the bridge site, and continued operation after warning, that caused the damage.

We have concluded that the proof in regard to the sudden full capacity operation, without notice, and under circumstances heretofore very generally outlined, presented a question of negligence for the jury's consideration. But the charge of wantonness, of course, presents a different question. The

116

employees at Magella are shown only to have had knowledge that the pier was being built, but we find no proof justifying a reasonable inference they had knowledge that at that particular stage of the work a full capacity operation would likely produce damage. Indeed, none of the employees are shown to have known of the progress of the work at that time. Alabama Power Co. v. Baley, 220 Ala. 540; 126 So. 847.

And in this connection, it may be observed that plaintiffs' proof tends to show that the cofferdam would have been completed, but for the accident, in ten days, and in twenty days they would have been entirely out of the water.

True, as plaintiffs argue, the continued and useful co-operation of defendant's employees during every day of plaintiffs' work, except the one time, would offer no excuse for a wanton disregard on this particular occasion. But we are of the opinion that the record of co-operation constituted a course of conduct between these parties, as to render it proper for consideration on the question of wantonness, which involves a state of mind of reckless and indifferent regard to the rights of others. And plaintiffs' testimony tends to show also that it was not the volume of water, so much as its sudden release and its velocity in the bridge site channel that caused the damage. The order for the 10–10 load was received at 8:25 o'clock in the morning, and within eleven minutes had been completed. It was not, therefore, according to plaintiffs' proof, the mere operation at full capacity, but this in connection with these other circumstances mentioned, that produced the injury.

Clearly, therefore, the mere fact that Hawkins and those under him at Magella knew plaintiffs were building a pier, and that Cox had been instructed to co-operate with them, would not suffice to show the giving of the order for the 10–10 load constituted a wanton act. The argument as to Hawkins may demonstrate that he had his mind, at the time of the order, on the efficient operation of defendant's plants from an economical standpoint rather than on plaintiffs; but the evidence does not justify any reasonable inference that he consciously acted wrongfully, and in reckless disregard of plaintiffs' rights. Nor did the employees at Jordan Dam know of the progress of plaintiffs' work, so that the obedience to the order would likely produce damage to them.

True, we have held admissible the proof that when Cox called over the telephone to give notice to plaintiffs, his voice sounded excited. But it was without dispute that the order for a full gate opening was executed by Gamble, whose assistant Dowd testified he did not know where Cox was at the time. Cox testified that the order was a normal operation, and he is vague in his recollection concerning what occurred, and cannot say definitely whether his call for Smith was just before or after the receipt and execution of the order. Adams, for the plaintiffs, answered the telephone call, and states Cox told him they were going to have high water that morning, as they were going to a 10–10 load, and in the same connection informed him the water had already been released. Admitting the proof that Cox's voice "sounded excited," yet that offers no support to the theory that Cox had consciously executed a wrongful order, with the knowledge that injury would likely follow. It would serve only as an indication that following the execution of the order (which he did not receive or execute) and the release of the water, Cox became fearful that in fact damage to plaintiffs might result; and it may tend to show a realization that some one had erred. But the fact of his calling and giving notice tends to repudiate the theory of any reckless disregard of plaintiffs' rights.

The situation is readily distinguishable from that presented in Barnum & Richardson Manufacturing Co. v. Wagner, 64 Ill. App. 375, cited by plaintiffs in brief.

It is suggested, however, that wantonness may be rested upon a failure on the part of Cox to shut off the water after Smith, in the telephone conversation immediately following the talk with Adams, had told him the water released would ruin them. The count here considered clearly in its averments gave no indication that plaintiffs relied upon a failure to shut off the water after warning, and our study of the record, including the oral charge of the court, impresses us that this was not made a material issue in the case. But this aside, we do not think a case of wantonness for that failure to act is made out by the proof. Smith's reply clearly indicated that the water already released would ruin them, and made no suggestion to Cox whatever, and the only reasonable interpretation of his conversation with Cox was that the damage was already complete, unless he could by his own prompt exertion save the work from wreckage.

While Carroll Smith does state that the destruction was not complete at 9 o'clock, and their work was subject to loss all day, and could not tell exactly when it went out, yet

it was admitted that as to the destruction "practically all of it" was complete at 9 o'clock, just as the answer to interrogatories had indicated. And his entire evidence leads us to the conclusion that the real and substantial damage was done, just as he had indicated in his conversation with Cox, by that first release of the water.

But whether there was some continued damage after that time or not, we do not think, under the circumstances here shown, that Cox was guilty of wantonness in a failure to cut off the water with no suggestion to that end, but with every indication given him that the ruin was complete, and nothing could be done to right the wrong.

Our conclusion is that defendant was due the affirmative charge on count A4 also, and that error was committed in its refusal.

We are persuaded also the learned trial judge has fallen into error upon the matter of the method allowed in proving plaintiffs' recoverable damages.

At the time of this accident much work on the construction of the bridge had been completed. All piers had been built, except this No. 6. And the 40-foot arch ring of the superstructure, and the floor slab were completed to the second pier. Much of what had been done is detailed by Fred Smith on page 403 of the transcript, and its further statement is not here material. The contract price was $177,000. The cofferdam was about one-half completed. It was destroyed with the breakwater, and the barge lost, together with some of the equipment. This work had to be done over again, and was rendered more difficult and expensive largely due to scattered rocks on the river bottom, and more labor involved, as it was considered advisable to construct the cofferdams and breakwater differently, and, of course, added material was involved. There was damage also caused by delay. If either material or labor had in the meantime increased, this was a matter of proof that would seem plaintiffs could readily supply. They knew what they were paying for labor at the time, and what was paid thereafter. If any material on hand was damaged by the delay or rendered valueless, this likewise was a matter of ready proof. The bridge in its then incomplete condition was not destroyed, but only damaged as affected by the destruction of pier 6, and we are unable to see why proof of the matters above stated (though in a very general manner) would not have sufficed in establishing data for the jury's determination of the damages suffered.

Plaintiffs, however, did not pursue that course, but were permitted, over defendant's objection, to express an opinion that the estimated cost under the original contract was $155,000, and that the reasonable cost, as well as the actual cost of construction after the accident, was $331,000. Counsel then stated, in asking the next question that the difference was $176,000, and before concluding his testimony the witness was permitted to state that nothing increased the cost of the bridge aside from the wreck. Thus, in effect, the witness was permitted to state to the jury the amount of damages suffered was $176,000. The jury's estimate of the witness' opinion is reflected in the jury's verdict, wherein it is followed with practical exactness.

In the early history of this court it was stated: "The general rule is, that witnesses must depose to facts, and cannot be allowed to give their opinions founded on these facts, or the inferences or deductions which they have drawn from them. To this general rule there are many exceptions, most of which are noted by Mr. Greenleaf, in his work on Evidence, vol. 1, § 440; and the question before us is whether this case proves one of the exceptions to the general principle. When the question to be ascertained is the value of property, the opinion of witnesses as to its value is frequently admitted, and, in many cases it would be difficult, if not impossible, to prove the value in any other mode. * * * But I have not been able to find any case that holds the opinions of witnesses, as to the quantum of damages resulting from any act, competent proof." Montgomery & West Point R. Co. v. Varner, 19 Ala. 185. And in Hames v. Brownlee, 63 Ala. 277, it is said: "The general rule is, that witnesses must depose to facts, and cannot be allowed to give their opinions, founded on these facts. * * * The reason is obvious: the verdict should express the jury's own independent conclusion from the facts and circumstances in evidence, and not be the echo of the opinions of witnesses, perhaps not unbiased." Numerous other cases are to like effect. St. Louis & S. F. R. Co. v. Cash Grain Co., 161 Ala. 332, 50 So. 81; Hardaway-Wright Co. v. Bradley Bros., 163 Ala. 596, 51 So. 21; City of Ozark v. Byrd, 225 Ala. 332, 143 So. 168.

As noted in all the cases, the general rule has its exceptions or limitations. One of these exceptions, noted in Central of Georgia R. Co. v. Jones, 170 Ala. 611, 54 So. 509, 510, 37 L. R. A. (N. S.) 588, Ann. Cas. 1912D, 863, is where language is inadequate to state the facts of a concrete case to the jury, and they

can be described only by the effect produced upon the mind of the witness, his opinion may be rendered. The opinion proceeds: "But the rule, as before stated, is different as to matters upon which the jurors themselves can form opinions if the facts or data are given them."

The exception noted in this last-cited case is differently stated in Adler & Co. v. Pruitt, 169 Ala. 213, 53 So. 315, 319, 32 L. R. A. (N. S.) 889, as follows: "But in many cases the opinions of ordinary witnesses are received from necessity, and where the nature of the subject is such that it cannot be stated or described in language which will accurately inform the judgment of the jury."

The courts are careful also to exclude opinion evidence which is dependent upon many contingencies and of too speculative a nature (Sloss-Sheffield S. & I. Co. v. Mitchell, 181 Ala. 576, 61 So. 934; Central of Ga. R. Co. v. Weaver, 194 Ala. 37, 69 So. 521), and even that of an expert where it is considered an invasion of the province of the jury (Alabama Power Co. v. Williams, 222 Ala. 75, 130 So. 788). And in Dersis v. Dersis, 210 Ala. 308, 98 So. 27, 30, it is said: "Opinions should never be substituted for obtainable facts capable of expression in words. The jury, and not the witness, must try the issue. The opinion should not be remote, speculative, or illogical."

The authorities cited by appellees (Guerini Stone Company v. P. J. Carlin Construction Co., 240 U. S. 264, 36 S. Ct. 300, 60 L. Ed. 636; Clarke Construction v. United States [C. C. A.] 290 F. 192; 3 Sutherland on Damages, p. 2691; Hardaway-Wright Co. v. Bradley Bros., 163 Ala. 596, 51 So. 21; Mobile Light & R. Co. v. Gadik, 211 Ala. 582, 100 So. 837; Strobel Steel Const. Co. v. Sanitary Dist. of Chicago, 160 Ill. App. 554) hold nothing to the contrary. They but recognize the exception to the general rule against the admission of opinion evidence when the "nature of the subject is such that it cannot be stated or described in language which will accurately inform the judgment of the jury." Adler & Co. v. Pruitt, supra.

But we are not persuaded this case comes within any of the recognized exceptions to the general rule. The bridge was built for the state as a permanent structure. No question of market value is involved so far as concerns the bridge. The wreckage involved pier No. 6. Its incidental effect, by way of loss or additional cost, upon the whole structure may, of course, be shown, but we see no occasion for opinion evidence as to the reasonable cost of the bridge as originally contracted and a comparison therewith of the cost following the accident. And we see no reason why the damages sustained may not be adequately presented to the jury by a statement of the facts relative to the injuries sustained and the economic loss occasioned thereby, rather than the conclusion of the witnesses.

By the method of proof sanctioned in the court below little room was left for the exercise by the jury of its own independent judgment. "The jury, and not the witness, must try the issue."

The conclusion is that the trial court committed reversible error as to this matter of proof.

■ A consideration of the conversation sought to be shown between Carroll Smith and Cox, the superintendent of Jordan Dam, after the institution of this litigation, is not persuasive that it contains anything indicative of an admission of a want of good faith or confidence in plaintiffs' cause. To us, it appears as only a friendly gesture by one gentleman to another that there may be no ill-feeling, notwithstanding the lawsuit.

There are a few remaining assignments of error which may not again arise, or, if so, in different form.

We have discussed what appear to be the salient points in the case, and which should suffice for another trial of the cause. As appears from the record before us, the issues will be simplified to that of the simple negligence count (A3), the general issue thereon, and plea of contributory negligence thereto.

For the errors indicated, the judgment will be reversed and the cause remanded.

Reversed and remanded.

ANDERSON, C. J., and FOSTER and KNIGHT, JJ., concur.