(129 So. 9)

## ALLISON COAL & TRANSFER CO. v. DAVIS.

### 6 Div. 558.

Supreme Court of Alabama.

May 31, 1930.

R. P. Evans and W. L. Hogue, both of Birmingham, for appellants.

Chester Austin, of Birmingham, for appellee.

THOMAS, J.

The suit was for personal injury caused by an automobile collision on the streets of Birmingham.

 The assignments of error challenge the overruling of demurrer to count one. The negligent conduct of defendant, by its agent or servant, that is available to plaintiff must be the proximate cause of the injury. When the whole complaint is considered, under the general terms of averment of negligence approved for such pleadings (Dwight Mfg. Co. v. Holmes, 198 Ala. 590, 593, 73 So. 933), the negligence averred, and the injuries catalogued, are properly averred as to be proximately caused by, or the proximate result of, the wrongful action of defendant's agent, as specifically indicated. Ruffin Coal & Transfer Co. v. Rich, 214 Ala. 622, 108 So. 600; Morgan Hill Paving Co. v. Fonville, 218 Ala. 566, 119 So. 610.

In count 2 it is charged that defendant's agents, servants, or employees. while acting within the line and scope of their employment, *wantonly* and *willfully* ran a truck into or against. etc. The distinction between intentional injury and wanton injury, and the different elements of proof required, were the subject of consideration in Adler v. Martin, 179 Ala. 97, 110. 59 So. 597; Feore v. Trammel, 212 Ala. 325. 102 So. 529; Louisville & Nashville R. R. Co. v. Calvert, 170 Ala. 565, 573, 54 So. 184; Central of Ga. Ry. Co. v. Corbitt, 218 Ala. 410, 118 So. 755; Ala. Power Co. v. Gooch, ante, p. 325, 128 So. 793.

When all of the evidence is considered. a jury question was presented as to defendant's agent's conscious act and conduct in the premises from his knowledge of the existing conditions, and that injury would probably result from his act, and with indifference to probable consequences, intentionally and con-

336

sciously drove into, or immediately in front of, the vehicle in which plaintiff was riding, and permitted his truck to collide or strike the said horse and vehicle, causing injury. A jury question was presented under the wanton count.

■ A conscious failure to use the required means to avoid peril, together with indifference as to consequence in the premises, may constitute willful misconduct, although *no actual intent* may exist to do the thing or cause the injury in question. Birmingham Railway & Electric Co. v. Pinckard, 124 Ala. 372, 26 So. 880; A. G. S. R. R. Co. v. Guest, Adm'r, 136 Ala. 348, 353, 34 So. 968. The expression in Adler v. Martin, 179 Ala. 97, 110, 59 So. 597, 601, is that " 'A partial employment of available means, evincing some degree of care, is not sufficient' to disprove wanton negligence. B. R. & E. Co. v. Pinckard, 124 Ala. 375, 26 So. 881. But such efforts might, in particular cases, be regarded as conclusive of the absence of an intention to injure," and is not to the contrary.

■ An approved definition of wantonness is the conscious failure of one charged with a duty to exercise due care and diligence to prevent an injury after discovery of peril, or under circumstances where he is charged with a knowledge of such peril, and being conscious of likely, probable, or inevitable results and injury of and from such failure. Birmingham Railway & Electric Co. v. Bowers, 110 Ala. 331, 20 So. 345; Birmingham Railway, Light & Power Co. v. Ryan, 148 Ala. 69, 76, 41 So. 616; Birmingham Railway, Light & Power Co. v. Williams, 158 Ala. 390, 48 So. 93; Southern Railway Co. v. Wooley, 158 Ala. 447, 48 So. 369. It is the conscious failure to exercise due care by one charged with a duty. Brown v. St. Louis & S. F. R. R. Co., 171 Ala. 310, 55 So. 107; Birmingham Railway & Electric Co. v. Pinckard, supra; Adler v. Martin, supra. And in Central of Ga. Rwy. Co. v. Corbitt, 218 Ala. 410, 118 So. 755, it is declared:

"To constitute 'willful or intentional injury' there must be knowledge of danger accompanied with design or purpose to inflict injury, whether act be one of omission or commission; while in 'wantonness' design may be absent and act done with knowledge of probable consequence and with reckless disregard of consequence.

"As regards element of knowledge of peril on part of person charged with wrong, there is no distinction in principle between subsequent negligence and willful or intentional wrong."

The evidence is that the driver of defendant's truck, without cause, left his side of the street and turned to that on which plaintiff was riding, and collided with the animal or vehicle propelling plaintiff, causing her precipitation upon the street, and her injury. The street was about forty feet in width, and had defendant's servant, at a reasonable and moderate speed, proceeded on his side of the street and passed where he belonged by the rule of the road—between the wagon and the curb—there would have been no injury. That is to say, the truck driver deliberately and intentionally left his side of the road, striking the animal and conveyance.

First avenue in the city of Birmingham, as disclosed by testimony, and photographs, is a wide thoroughfare with two street car tracks along the surface of same; and is paved; and the intersecting street in question, Fifty-Fourth street, is disclosed as an abutting, entering street. At or near the point of junction of this street and First avenue, the collision took place, defendant's truck traveling east on the avenue and the wagon north on Fifty-Fourth street into the avenue. As to willfulness, the witness Archie Edwards testified, as to the contention of plaintiff, that at the time the wagon started into First avenue, the defendant's driver and truck were 200 feet away, going 35 or 40 miles an hour; that the wagon then pulled across First avenue and the driver tried to get out of his way after he saw him, and the truck driver tried to beat him around, tried to run around ahead of the animal pulling the wagon, and in doing this caused the collision. He further testified as follows:

"I saw this truck two blocks away, because it happened in the day time. It was a Chevrolet truck and it had a load of coal on it. This truck was coming 35 or 40 miles an hour, and it was coming over towards the wagon, but not towards me, as I was standing on the sidewalk. When I first saw this wagon it was stopped waiting on the truck to come by so he could pull across into 1st Avenue. I won't be certain about the wagon staying on 54 Street 5 minutes until the truck got to the intersection, but he stood there until he seen the traffic was clear. When the wagon first entered 1st Avenue from 54th Street the truck was probably between 53rd and 54th Street; just about middleways of the block. The truck wasn't then a block and a half away from the wagon; it was between 53rd and 54th Streets. I couldn't say how many feet away it was at that time, but to the best of my judgment I would (say) it was about 200 feet away when this wagon started into 1st Avenue. The wagon then pulled across 1st Avenue. He tapped his horse, and tried to get out of the boy's way, and after he seen him the boy tried to beat him around; tried to run around ahead of the horse. The truck in coming went to the right, and tried to go around the horse's head; I mean to the left of the horse's head. This truck didn't pass the wagon; it hit the wagon; it couldn't pass the wagon, but hit the horse. The front end

of the truck hit the horse. The truck did not come in contact with the wagon at all, but hit the horse, and naturally hitting the horse, it knocked the lady out of the wagon. The truck hit the wheel of the wagon; the left front wheel. It hit both the horse and the wagon. The whole front end of the truck hit the left front wheel of the wagon. He headed down 1st Avenue to the man going across. When the wagon started into 1st Avenue, and across 1st Avenue, the truck was about 200 feet away, to my estimation of it. The wagon was going across 1st Avenue, headed towards town. The wagon was on the right hand side of 1st Avenue when the truck hit it, and the wagon had crossed all the way across 1st Avenue except the two rear wheels when the truck hit it, and the horse was down across the car line into the other street going into town."

The account of the collision is thus given by Arthur Ballard:

"When I first saw this wagon it was in there about the center of the street after you come into the intersection. In other words, the wagon was about the center of 1st Avenue when I first saw it, and when I first saw the truck it was about 15 or 20 feet from the wagon, coming down 1st Avenue, and it seemed to me like instead of coming between the wagon and the curb, it tried to beat the wagon around this way (indicating); it tried to go around in front of the wagon, to the left. It killed the horse, you know," etc.

"We had been waiting on the Allison Coal & Transfer Company trucks ever since the 81 Tire Company had been there, and I helped them move up there from Cook's place. I knew that he was driving for them, as it had their name on the side of the truck, and that is the only way I knew that he was driving for the Allison Coal & Transfer Co.

"Whereupon the following occurred:

"Q. What is the only way you knew? A. That he was driving for Allison?

"Q. Yes. A. No, sir; I knew that he was driving for Allison. We waited on him and Allison truck, and he was driving. I know the boy personally, and know where he lives. That is the onliest way I knew it."

Defendant's witness, D. C. McLeod, said:

"The wagon just approached 1st Avenue and didn't check at all; just drove right on in, and the truck was coming, going towards East Lake, and the boy driving the truck turned to the left. Just as the wagon came into the intersection I would say that the truck was about 20 or 30 feet away from the intersection when the wagon hit the intersection, back towards town. * * * You ask me where the wagon was with reference to 1st Avenue when the truck collided with it, and

you know there is a line between the car lines; there is a center line in the street, and he was about the center line when he hit him; possibly a little bit beyond the center line on this side, where he hit the horse. * * *

"I was not watching the old negro and his wagon, but I saw the wagon, and I do know that he did not stop there at the intersection of 54th Street and 1st Avenue. I was looking in that direction from the time he came in view to the time he came out on the street, but I was not watching him continuously, but if I diverted my gaze I do not recall it. * * * He went straight the street. I said the truck struck the horse at the center line of the car track, but the wagon had not crossed the center line, and the horse had not crossed the center line, because he was hit on the front, and at the time he was possibly making the turn towards town, or going straight; at the time he was struck he was still going across the street. * * * I would say that it was not over 60 feet down the street when I first saw it, and at that time the truck was on his side of the street. I didn't notice the truck as the wagon was coming into 1st Avenue there. I did not say that after the wagon came into 1st Avenue that the truck was 60 feet away. I said that I judged the truck was 60 feet when I first saw it."

The evidence and inferences therefrom made a jury question, and there was no error in refusing the affirmative instruction requested by defendant. McMillan v. Aiken, 205 Ala. 35, 40, 88 So. 135.

There was no error in refusing to exclude the evidence of Arthur Ballard. He stated the facts as set out above, and were not mere conclusions of the witness.

The evidence did not present error in overruling the motion for new trial. The preponderance of the evidence supported the ruling.

Affirmed.

ANDERSON, C. J., and SAYRE and BROWN, JJ., concur.