WUNDERLICH et al. v. FRANKLIN.

No. 8872.

Circuit Court of Appeals, Fifth Circuit.

Dec. 2, 1938.

Rehearing Denied Jan. 16, 1939.

McCORD, Circuit Judge, dissenting.

D. M. Powell, of Greenville, Ala., for appellants.

**166**

Richard T. Rives, of Montgomery, Ala., E. O. Baldwin, of Andalusia, Ala., and B. W. Smith, of Samson, Ala., for appellee.

Before HUTCHESON, HOLMES, and McCORD, Circuit Judges.

HOLMES, Circuit Judge.

This appeal is from a judgment for appellee in an action for the wrongful death of her husband and intestate, Horace Franklin.

Appellants contracted with the state of Alabama for the construction of a road from the town of Opp to the town of Andalusia, both in said state. Under this contract, they obligated themselves to provide, erect, maintain, and finally remove all necessary barricades, suitable and sufficient lights, danger signals, and signs; to provide a sufficient number of watchmen; and to take all necessary precautions for the protection of the work and the safety of the public.

As the construction of the road progressed, it was opened at times to the use of the public, such use being favorable to the work in that it aided and accelerated the packing and settling of the fills and the curing of the fresh earth for the foundation. When the final operation of putting the surface on the road began, it was necessary to prevent any use of it whatever, because such use rendered the foundation unsuitable for surfacing, and necessitated a repetition of what had previously been done.

The work of surfacing was done by sections, and appellants experienced great difficulty in preventing traffic thereon. Barricades were removed or destroyed by trespassers, and warning lights and signs were disregarded. In one instance, a barricade of heavy wooden timbers, fastened to posts set in the ground, with heavy chains holding the timbers in place, was removed by loosening the chains and dragging the timbers to one side. Appellants caused a barrier to be erected across the center span of a bridge, which formed a part of the highway, by stretching heavy wire cables from one side of the bridge to the other and making them fast with cable clamps, or U-bolts, a fastening which would not allow the cable to give or slip, and which could not easily be removed. This barrier was erected to protect a section of the road beginning at one end of the bridge. Brush and shrubs were interwoven in the strands of the cable, as a warning to any one who might approach, but no lights were placed at or near the barrier. Primary barricades were erected and maintained at each end of the road and at all entrances thereto, and each of these barricades bore signs advising the public that the road was closed, and was illuminated by warning signs at night.

Horace Franklin maintained his home in Andalusia, which place he left about five days before his death and one week after the erection of the cable barricade mentioned above. He was employed as a truck driver for an oil company, and, after spending the week-end with his family, drove to Opp in his truck to resume his duties to his employer. On this trip, he undertook to follow the new highway, but was prevented from doing so by the barricades which had been erected. On the night of his death, he left Opp to drive to Andalusia, and his dead body was found the next day at the cable barricade mentioned above. When found, his head had been severed from his body and was lying under the top of the steel cab of the truck he was driving, both having been torn off after the truck had collided with the lower strands of cable, bending the members of the bridge to which they were fastened, and passing underneath, carrying the headless body to a point about forty feet beyond, where the truck left the highway and capsized.

On the record here, it is conceded that the deceased was a trespasser on the highway and was guilty of contributory negligence when he met his death. If recovery is to be allowed, liability must be predicated upon wanton negligence on the part of appellant in erecting the cable barrier, and failure to provide lights at night. In determining liability, we are bound by the decisions of the Supreme Court of Alabama. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487.

A review of the numerous Alabama decisions does not disclose any departure from the concept announced by Mr. Justice Bigelow, in Sweeny v. Old Colony & N. R. Co., 10 Allen, Mass., 368, 87 Am.Dec. 644, that "all the cases * * * in which a party is sought to be charged on the ground that he has caused a way or other place to be incumbered or suffered it to be in a dangerous condition, whereby accident and injury have been occasioned to another, turn on the principle that negligence consists in doing or omitting to do an act

by which a legal duty or obligation has been violated." However, the rule announced in that case, barring recovery by a trespasser for an injury occasioned by a dangerous condition of the premises, is avoided if it can be shown that the condition was brought about by wanton negligence as defined in the Alabama decisions. We have found no case distinguishing between active and passive negligence, or a dangerous or latent condition of the premises and the operation of a force in motion. If the element of wantonness is found to be present, liability is imposed without regard to the wrongful acts of the injured person or his contributory negligence. Alabama Great Southern R. Co. v. Guest, 144 Ala. 373, 39 So. 654; Alabama Great Southern R. Co. v. Williams, 140 Ala. 230, 37 So. 255.

In defining wanton negligence, the Alabama courts emphasize the necessity that the lack of care and disregard of probable consequences be so great that, in its ethical aspects at least, it be analogous to a will or intention to produce the result. A clear distinction between willful and wanton injuries is maintained on the basis of distinct elements, but the cases do not lose sight of the fact that, in holding liability for wanton negligence, they are treating the wrongdoer as if he had actually intended the result. Thus in Feore v. Trammel, 212 Ala. 325, 102 So. 529, the problem is dealt with in the following language [page 533]:

"Be it understood that 'intentional injury' and 'wanton injury' are 'moral equivalents,' but 'their elements are different, and proof of the one would not suffice of proof of the other.' Birmingham R., L. & P. Co. v. Ryan, 148 Ala. 69, 41 So. 616; Alabama G. S. R. Co. v. Ensley Transfer & Supply Co. [211 Ala. 298], 100 So. 342. If willful injury is charged, it must be shown that it was 'intentionally and designedly' done. Adler v. Martin, 179 Ala. 97, 109, 59 So. 597, and authorities. In Birmingham Ry. & Elec. Co. v. Bowers, 110 Ala. 328, 20 So. 345, it is declared:

" 'Where a person, from his knowledge of existing circumstances and conditions, is conscious that his conduct will probably result in injury, and yet, with reckless indifference, or disregard of the natural or probable consequences, but without having the intent to injure, he does the act, or fails to act, he is guilty of wanton negligence. A purpose or intent to injure is not an ingredient of wanton negligence, and if either of these exists, and damage ensues, the injury is willful.'

"This distinction has since been observed by this court. Southern Ry. Co. v. Wooley, 158 Ala. 447, 48 So. 369; Merriweather v. Sayre Min. & Mfg. Co., 161 Ala. 441, 49 So. 916; Merrill v. Sheffield Co., 169 Ala. 242, 53 So. 219; Louisville & N. R. R. Co. v. Calvert, 170 Ala. 565, 54 So. 184; Birmingham R., L. & P. Co. v. Drennen, 175 Ala. 338, 57 So. 876, Ann.Cas.1914C, 1037; Adler v. Martin, 179 Ala. 97, 59 So. 597; Vessel v. Seaboard A. L. Ry. Co., 182 Ala. 589, 62 So. 180; Shepard v. Louisville & N. R. R. Co., 200 Ala. 524, 76 So. 850, and authorities.

"It follows from the decisions that to establish a willful or intentional injury the proof must establish the same was inflicted designedly and intentionally; to constitute wantonness, that the party charged, or his servant acting for him in the premises, was conscious of the conduct which caused the injury, and conscious, from his knowledge of the existing conditions, that injury would likely or probably result from his conduct or omission to act, and with reckless indifference to consequences he consciously and intentionally did the wrongful act or omitted to do or discharge some known duty in the premises which produced the injurious result declared for in the complaint. Shepard v. Louisville & N. R. R. Co., 200 Ala. 524, 76 So. 850; Alabama Power Co. v. Conine, 210 Ala. 320, 97 So. 791; Birmingham R., L. & P. Co. v. Cockrum, 179 Ala. 372, 60 So. 304."

See, also, Sington v. Birmingham Ry., L. & P. Co., 200 Ala. 282, 76 So. 48, and cases cited.

Thus, in determining whether or not appellants are liable, we are concerned with the state of mind of their agent and foreman at the time when the barricade was erected and while it remained in place. Authority to close the road was given by the contract with the state and section 1397 (34) of the Alabama Code of 1928. It is contended that appellants' agent and foreman acted improperly in directing that cables be stretched across the bridge and be made secure thereto; that both the location and type of barricade were improper.

As to the location of the barrier, it does not seem to be material to this case case whether it was placed on a bridge, an embankment, or within a cut. The death of appellee's intestate occurred when his head was severed from his body by the

strand, and the ensuing plunge of the truck from the embankment could not aggravate his injury. There is nothing to indicate that it would have been more easily seen at any other location. The duty of the deceased to exercise due care and caution for his own safety was just as great while he was crossing the bridge as while he was travelling on level ground. Thus, appellants' agent had a right to assume that any one trespassing on the highway would be on the lookout for obstructions at this point, as well as any other.

█ As to the type of barricade, the chief complaint is that the cable was securely fastened with clamps, or U-bolts, so that it could not give or slip. The right to erect a barrier presupposes that the barrier, when erected, will be one which will turn back traffic. The record here discloses that the deceased was killed because the truss members and railing of the bridge, to which the cables were attached, gave way, allowing the truck to pass through. Whatever may have been the result if the truck had struck an immovable object at the center of the bridge, it clearly appears that Franklin's head would not have been sheared off along with the top of the cab as the truck passed under the cable. But be that as it may, no one could complain that the barricade was too substantial or of a particular type, since these are matters within the discretion of the contractor, his sole duty being to provide suitable warning after the barricade is erected.

█ Appellee insists that liability should be predicated upon the failure of appellants to provide warning lights for the barrier at night. It is not contended that the provision in the contract requiring lights at barricades confers any greater right upon the public, or imposes any greater duty upon appellants to the public, than at common law. In determining what notice of conditions and circumstances appellants and their agents are chargeable with, it is of probative value and may be considered in determining their state of mind. It may be conceded for the purposes of this case that appellants are chargeable with simple negligence in not providing lights for the barrier. Carter v. Franklin, 234 Ala. 116, 173 So. 861. The question remains, did their action or failure to act, in erecting and maintaining the barrier without warning lights, attain that degree of culpability attributable to an intentional injury under the laws of Alabama? We have seen that barricades were erected with proper signs and lights at all entrances to the highway. These were sufficient to put any one entering thereon on notice that the road was under construction and that, if they traveled on the highway, they must expect to encounter conditions different from what otherwise might be expected. Thus, due care and caution for their own safety required that travelers on the highway maintain constant vigilance for such obstruction and defects as might exist in the course of the construction.

It is immaterial whether the lighted barriers were down at the time the deceased began his journey, or that he may have entered the highway at some unusual and unexpected place, thereby failing to receive the warning provided. The wantonness of appellants' conduct and that of their agents depends, not upon what the deceased knew, but upon what they knew or should have known. The evidence is uncontradicted that lighted barriers were provided, and that they effectively gave notice that the road was under construction. It is also uncontradicted that the view of the cable barrier at which the accident occurred, with the bushes and branches interwoven between the strands, was unobstructed for more than one thousand feet in each direction. Aside from common prudence the statute laws of Alabama require that motor vehicles driven on the highway at night be equipped with headlights, and forbid driving at a reckless or excessive rate of speed. While these matters do not afford a defense for wantonness, once it is found to exist, they must be taken into consideration where the facts and circumstances are relied upon to establish its existence. Thus, it would not be wanton to assume that a traveler would not proceed on the highway without lights or at an unreasonable rate of speed. Neither would it be the moral equivalent of intentional injury to assume that a reasonable rate of speed under such circumstances would be one which would allow a driver to stop within the distance in which an obstruction would become plainly visible in the light from the vehicle. The case against appellants is that they failed to foresee that persons wrongfully on the highway would not exercise care for their own safety. It is not wanton negligence to assume that another will exercise due care and caution for his own safety. It has been stated in Alabama Great Southern R. Co. v. Hall, 105 Ala. 599, 17 So. 176, 179: "Before one can be held guilty of 'willful' or 'wanton and reck-

less negligence' the facts must show either that the party knew his conduct would inflict injury, or the facts must show that, on account of the attending circumstances, which were known to him, or a knowledge of which he was chargeable with, the inevitable or probable consequences of his conduct would be the infliction of injury, and with reckless indifference to the consequences committed the act or omitted to perform his duty. Georgia Railway Co. v. Lee, 92 Ala. 262, 9 So. 230; Louisville Railroad Co. v. Webb, 97 Ala. 308, 12 So. 374." See, also, Southern R. Co. v. Benefield, 172 Ala. 588, 55 So. 252, 35 L.R.A., N.S., 420; Central of Georgia R. Co. v. Corbitt, 218 Ala. 410, 118 So. 755; Alabama Power Co. v. Gooch, 221 Ala. 325, 128 So. 793; Allison, etc., Co. v. Davis, 221 Ala. 334, 129 So. 9; Buffalo Rock Co. v. Davis, 228 Ala. 603, 154 So. 556; Alabama Power Co. v. Smith, 229 Ala. 105, 155 So. 601.

The conclusion reached above renders it unnecessary to consider the questions presented as to the sobriety of the deceased on his departure from Opp, and whether or not he expressed an intention to demolish the barrier. For the reasons stated, it appears that the request for an instructed verdict should have been granted.

The judgment of the district court is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

McCORD, Circuit Judge (dissenting).

I cannot bring myself to concur in the majority opinion.

Under the rules of pleading in Alabama the complaint, which contains three counts, the same being numbered 16, 17, and 18, states a cause of action for wanton or wilful misconduct. Buffalo Rock Company v. Davis, 228 Ala. 603, 154 So. 556; Blankenship v. Van Hooser, 221 Ala. 542, 130 So. 63.

Only one question is here for decision: Was the jury authorized, under the evidence, to find wanton or wilful misconduct chargeable to the defendants?

The contractors, appellants, were engaged in reconditioning or reconstructing, for the State Highway Department of Alabama, a road leading from Opp to Andalusia, Alabama. Work on this road had been going on for several months. The contractors building this road had entered into this solemn contract with the State of Alabama: "The contractor shall at his own expense provide, erect, maintain and finally remove all necessary barricades, suitable and sufficient red lights, danger signals and signs; provide a sufficient number of watchmen, and take all necessary precautions for the protection of the work and safety of the public. Highways closed to traffic shall be protected by effective barricades on which shall be placed acceptable warning and detour signs. All barricades and obstructions shall be illuminated at night and all lights for this purpose shall be kept burning from sunset to sunrise."

The evidence is without dispute that the contractors, as they worked on this road, opened it from time to time to the public. This was done, not to oblige the public, but to aid the contractors. This had been going on for months. J. R. Ramey, the defendants' superintendent, testified, "There were times when it was open or closed. There were times after it was closed when it was reopened and closed again." Ben Wescott, one of the foremen for defendants, followed his superintendent and testified, "I knew about the highway being closed to travel at times and opened at times. There were certain times during the construction of the road when traffic was desirable, that is for the compaction (packing) of the road to harden the road, but during rainy times, if any traffic was on the road it would cause ruts or change the surface of the road, where it would have to be finished again. During dry times and during preparation of the subgrade, we encouraged the traffic, and even directed it over different parts of the road, so as to compact (pack) all of the road. * * * I said traffic was desirable on this road at times. The barricades would be taken down and people would be invited to travel across the road. That would help pack it down." (Italics mine).

The travelling public, when the road was closed, would try and did break over from time to time and go upon the road. Moreover, the workmen would open and leave open the barricades and the public would persist in using the road. This displeased and angered J. R. Ramey, the superintendent of the contractors, who was in direct charge of the construction.

This same Ramey, superintendent in charge, approached one of his employees, William Wages, and asked him to put a steel cable or rope across the bridge which spanned the creek and which was a part of the road under construction. Wages

testified that he suggested to Ramey the putting of barricades away from the bridge, but Ramey insisted on the cable on the bridge and witness told him of the danger of someone running into it, and then Ramey left him alone. But this man Ramey was irritated and mad: On or about January 1, 1935 he caused to be stretched from side to side of the bridge a grey and rusty wire or rope cable. This wire or rope cable was securely fastened to the structure of the bridge on each side thereof, being laced across the way or traversed part of the bridge, and fastened with U-bolts so that it would not give or yield to pressure. Ramey testified, "I never give him any instructions about lights; there was never a light there as I know of."

It was finally conceded by the contractors that *"there were no instructions to put lights on this barricade and that none were there."* (Italics mine). Ramey was still mad, and although the contract directed that: "All barricades or obstructions shall be illuminated at night", he forgot to remember.

Horace Franklin, the deceased, attempted to pass over this bridge in the night time, driving a gas truck. He ran his truck into the wire rope or cable and his head was severed from his body.

So that we may understand fully the wanton and wilful misconduct of the superintendent of the contractors, let us for a minute quote further from the evidence. While the evidence was in sharp conflict, J. W. Kelso, state auditor of the Woodmen of the World, Ed. Lowe Paul, then an employee of the defendants, H. H. Dorsey, street superintendent for the City of Opp, Tom Hart, a deputy sheriff, and William Danley, testified that "on the night of the accident the road was not barricaded but was open to the bridge," where the accident occurred. Ed. Lowe Paul, testified, "I watched up until Sunday before he was killed Friday—Thursday night or Friday morning. I know about the direction of the cable across the highway down at Poley creek. They took me off at that time. They took all the guards off at that time. * * * There were no guards at the different places after this rope was put down at Poley creek on Sunday up to the time Mr. Franklin was killed." Witness Lloyd testified, "I remember the occasion the company put that cable across the bridge down at Poley creek. I don't think I guarded any after that. The best I

know the guards were taken off at that time."

Superintendent Ramey testified further, "I had a great deal of trouble with people coming around the barricades and coming on this road, even though we had wooden barriers on it. * * * All this barricade was placed there for was to stop traffic."

Ollie Wiggins testified, "During the time that this road was opened to the public I would, at times, see lights along the side of the road burning, or at the entrances of the streets. Then a lot of times those lights would go out and there would be a few hours or a day or two it would not be burning, not all of them. That would be when the road was open to the public." F. E. Lloyd testified, "During the time it was open to the public I would see lights burning at the intersections of some of the streets that lead into the road from the Cotton Mill at Opp. * * * There were some of the streets that were never barricaded, even when the road was closed to traffic. * * * There were lights at nearly all the barricades but sometimes you would find them out and sometimes you would find them on. I have seen the lights burning when the road was open."

Former employees testified that Ramey said he wanted the cable put up so that "if one hit the cable it would stop them; he wouldn't go any further." And, "if anyone ran into it, no one would run into it anymore." Certain it was that Ramey was irritated and mad. One witness testified: "The cable was stretched in the main steel span right in the run of the creek in the center of the bridge. There were six or eight strands of cable. The top strand was a little higher than my head."

Rufus Paul testified, "We didn't put any bushes there at the time. I don't know when those little bushes were put there." Rainer, the undertaker, testified, "I did not see any light or anything to indicate that the barricade was there. There were no lights there. Some brush had been stuck in there; of course when I saw it it was on the side. They were a little above the cable, probably four or five feet; had been put in there, they were on the side of the cable, woven through, sticking in the side of the cable like. They were to the side when I went there." One of the witnesses testified that he walked into the cable on the night of the accident. William Danley a witness, testified that on the

same night Horace Franklin was killed, he was driving slow and just bumped the cable and stopped. "There was no warning of that cable before I got to it; I didn't see any light or anything. I didn't notice no bushes at all. It hadn't been closed back there and I thought it was open."

Ramey, the superintendent, became incensed, irritated, and mad. Two fifty cent red lanterns placed at the approach of this bridge would have saved the life of Franklin. Ramey deliberately set a death trap across the creek in question and Horace Franklin rides no more.

The majority opinion tells us the act of this superintendent was not wanton or wilful and that the defendants must go unwhipped of justice. I decline to concur in the opinion.

I respectfully dissent.

On Motion for Rehearing.

PER CURIAM.

As neither of the judges who concurred in the judgment of the court in the above numbered and entitled cause is of the opinion that the petition for rehearing should be granted, it is ordered that the said petition be and the same is hereby denied.

McCORD, Circuit Judge, dissents.