## WOODWARD v. ATLANTIC COAST LINE R. R.

### No. 6357.

Circuit Court of Appeals, Fifth Circuit.

April 15, 1932.

E. R. Dickenson and Wm. M. Gober, both of Tampa, Fla., for appellant.

T. Paine Kelly, of Tampa, Fla., for appellee.

Before BRYAN, FOSTER, and SIBLEY, Circuit Judges.

SIBLEY, Circuit Judge.

Mrs. Woodward sued Atlantic Coast Line Railroad for the negligent homicide of her husband upon a street crossing in Tampa, Fla. A verdict was directed against her, and the sole question is whether there was evidence sufficient to carry the case to the jury. The sufficiency of evidence in this connection does not refer to the credibility of the witnesses, but to the legal and logical effect of the facts testified to if believed by the jury. A trial judge may, in the exercise of a sound discretion, set aside a verdict because he is convinced that the jury have wrongly found the issues of fact, the result of which will be another trial before another jury; but he may not prevent the case going to verdict and decide it himself because he does not credit substantial evidence for one party, and would on that account be disposed to set aside a verdict in his favor. Howard v. L. & A. Ry. Co. (C. C. A.) 49 F.(2d) 571, 574. "Issues that depend on the credibility of witnesses, and the effect or weight of evidence, are to be decided by the jury. * * * Where uncertainty as to the existence of negligence arises from a conflict in the testimony or because, the facts being undisputed, fairminded men will honestly draw different conclusions from them, the question is not one of law but of fact to be settled by the jury. Richmond & Danville Ry. Co. v. Powers, 149 U. S. 43, 45, 13 S. Ct. 748, 37 L. Ed. 642." With these principles in mind, we think the judge infringed upon the right of jury trial in directing a verdict in this case.

The deceased was shown to be a young man with a wife and baby, $40 cash in his pocket, and a job awaiting him. He had arrived in Tampa the day of his death, going with his family to the home of his wife's stepfather. The stepfather had a night job, and the deceased accompanied him to work, leaving him early in the night to go back home. His route to the street car would have been by Ashley street. That street was crossed, by the main line and other tracks of the railroad company. The main line was guarded at the crossing by safety gates which were to be lowered when trains were to pass. Just beyond the gates two spur tracks crossed the street, passing eastward-

ly between two long roofed platforms for unloading automobiles from these tracks. The gates did not include these tracks, and were not lowered when a train used them. The street was paved across all the tracks, but the sidewalk paving stopped with the buildings, and did not continue past the ends of the sheds and across the tracks. At about 12:45 o'clock at night the deceased was found by a train crew 180 feet west of Ashley street on the southernmost spur track, left arm and leg crushed, body bruised, dirty and bloody, clothing torn off, unconscious and dying. The blood signs showed he had been dragged down the track from a point about in line with the east sidewalk.

An engine handled by the crew had just gone east across Ashley street on this spur track, had gotten three or four cars from alongside one of the sheds, and had backed out across the street and over the place where deceased was found. The conclusion is fully warranted that this train had dragged him there from the point where the first blood signs were found. The switch foreman testified that the blood began about where the first truck of the first car had stood, and that where the center of that car was were signs on the ground as if some one had wallowed there. It is suggested that deceased may have been asleep there, but with the crew present, coupling to this car and then to the next one a few feet behind it, it is unlikely that the slow movement could have killed a man without an outcry being heard, nor is it likely that deceased in his circumstances would have chosen that place to sleep. Other witnesses put the blood signs nearer the east side of the street pavement, and in the line of the sidewalk had it been paved. While the fair inference from some of the evidence is that the engine when coupling did not clear the street, according to other evidence the tender passed east of the street, leaving it unobstructed. In passing east across the street the engine was going forward. One of the crew was riding the front and one the rear of it, and the switch foreman was observing the crossing. They saw nothing of deceased. When the engine recrossed, it was going backwards. No one was riding the tender, and no one apparently observing the crossing.

Two colored witnesses standing fifty feet away where Ashley street crosses Polk street testified that a man passed them going down Ashley street towards the spur track, the street then being clear of safety gates and train, that they heard screams as if some one were hurt, and saw a box car being pushed out into Ashley street from the east at "a pretty fair speed" with no person or light on it and heard no bell. The pedestrian had disappeared, and no one was in sight. The crew apparently had not heard the screams, for the train did not stop. These witnesses thought the man they had seen had been hurt, but did not wish to be involved and went the other way. They saw an account of his death in the newspaper next morning. The employees of the railroad testified that the engine bell was ringing the whole time, that the safety gates were not down, and that it was the duty of the train crew to protect the crossing when the spur tracks were used. Supposing the negroes to be worthy of credit, it might fairly be concluded that the deceased was walking down the sidewalk, went straight ahead across the tracks, was misled by the raised gates, or perhaps negligently did not observe to right and left, and was struck by the rear of the engine tender which the negroes mistook for a box car. By sections 7051, and 7052, Comp. Gen. Laws of Fla., the railroad is liable, unless it shall make it appear that their agents have exercised all ordinary and reasonable care and diligence; and the contributory negligence of the deceased goes only to mitigate damages. Farnsworth v. Tampa Electric Co., 62 Fla. 166, 57 So. 233. Backing a train across a village street without lookout or flagman, even at a slow speed and in daylight, has been held to be negligence. Florida Central R. R. v. Foxworth, 41 Fla. 1, 25 So. 338, 339, 79 Am. St. Rep. 149. The case ought to have gone to the jury. Claughton v. Atlantic Coast Line R. R. (C. C. A.) 47 F. (2d) 679.

Judgment reversed.