**C. A. THOMAS, Appellant,**
v.
**ATLANTIC COAST LINE RAILROAD COMPANY, Appellee.**

**R. O. PLANK, Appellant,**
v.
**ATLANTIC COAST LINE RAILROAD COMPANY, Appellee.**

**No. 15022.**

United States Court of Appeals
Fifth Circuit.

June 2, 1955.

Rehearing Denied July 22, 1955.

Miller, Miller & Hewitt, Wareing T. Miller, West Palm Beach, Fla., Clarence J. Brown, Jr., Miami, Fla., for appellants.

Frank A. Howard, Jr., H. Reid De-Jarnette, Miami, Fla., J. A. Franklin, Parker Holt, Fort Myers, Fla., Dixon, DeJarnette & Bradford, Miami, Fla., Henderson, Franklin, Starnes & Holt, Fort Myers, Fla., C. C. Howell, Atlantic Coast Line Railroad Company, Wilmington. N. C., for appellee.

Before HUTCHESON, Chief Judge, and RIVES and TUTTLE, Circuit Judges.

TUTTLE, Circuit Judge.

Appellee's statement of the case appears to be clear and accurate, and we adopt and supplement that statement:

"This appeal involves two actions for damages brought against the appellee Railroad to recover the value of property lost in a fire on February 20, 1951. The locale of the property, and of all events of that day, was Lake Harbor, Florida, a small farming hamlet southeast of Lake Okeechobee and forming the point of interchange between the southern end of the Atlantic Coast Line Railroad tracks, and those of the Florida East Coast Railway leading south. The surrounding country is open farmland and glades area, with muck soil.

"On February 20, 1951, the appellant Thomas was the owner of a building used as a warehouse and packing house, located upon land owned by the appellee Railroad and forming part of its right-of-way immediately south of its tracks in Lake Harbor, Florida. The land upon which the building stood was leased to Mr. Thomas for a rental of $60.00 per year, and included an indemnity provision whereby the lessee agreed to save harmless the Railroad any liability for loss or damages to the lessee's building or its contents 'whether the same is the result of fire caused by negligent emission of sparks from the locomotive engines of Lessor, or otherwise, however resulting.' (Plaintiff's Exhibit 20).

"Appellant Plank had a sublease from Thomas, with the approval of the Railroad, covering a leanto shed located at the southeast corner of the packing house, and in which he operated a machinery repair shop. Under the terms of the sublease Mr. Plank was also bound by the indemnity provision in the original lease.

"During the early evening of February 20, 1951, the entire packing house was destroyed by fire, and thereafter the appellants Thomas and Plank filed separate suits in the state court against the Railroad, attaching copies of the lease and sublease to their respective complaints, and claiming damages for the loss of the building and the property stored inside. The cases were removed to the United States District Court for the southern district of Florida.

"The significant allegations of both complaints are identical, and charge the Railroad with 'gross, wilful and wanton negligence,' with 'reckless disregard of defendant's duty to protect plaintiff against injury,' and with 'an intention to invade a legally protected interest of the plaintiff.' The complaints then set forth that the employees of the Railroad first set fire to a pile of debris close to the building owned by Thomas, then left the fire burning and departed from the scene, and finally that the Railroad's depot agent, having been notified of the fire, was dilatory in reporting its existence.

"Upon motion of the defendant setting up the indemnity provision in its lease as a bar to the actions, the District Judge dismissed the complaints. The plaintiffs appealed, and this Court reversed, holding that the clause was valid and would exempt the Railroad from liability for ordinary negligence, but would not apply if *wilful or wanton* negligence were proved. Further holding that the complaints could be construed as alleging *wilful or wanton* negligence (but

expressly withholding opinion upon the adequacy of the facts alleged), the Court remanded the cases for trial on the merits. See Thomas v. Atlantic Coast Line Railroad Co., 5 Cir., 1953, 201 F.2d 167.

"The Railroad filed its answer to each complaint denying the acts alleged and all claims of wilful or wanton negligence, and set up the indemnity provision in its lease as an affirmative defense. The cases were consolidated and tried together in July, 1953."

The taking of testimony before the court and a jury began on the morning of Friday, July 10, 1953, and was not concluded until the late afternoon of Tuesday, July 14th. The district court denied the motion of the defendant for a directed verdict made at the close of plaintiffs' testimony. When all of the testimony was in, the defendant renewed its motion for a directed verdict assigning an additional ground as follows:

"Comes now the defendant at the close of all the testimony and renews the motion heretofore made for a directed verdict upon the grounds therein stated, and upon the additional ground that it now appears from the affirmative testimony of the employees and agents of the defendant that the defendant has not been guilty of wanton or wilful negligence or any act which would intentionally harm the property of the plaintiffs."

After argument on the motion, the following occurred:

"The Court: Well Gentlemen, I don't think that there is sufficient evidence to warrant the jury considering this case, or these cases, from the standpoint of wilful or wanton negligence, so I am going to grant the motion.

"Mr. Brown: May I suggest in order to save expense of the parties, in view of the fact that we have gone this far, that Your Honor reserve ruling and submit this matter to the jury so that in the event the jury should return a verdict in favor of the railroad, then there would be no need of appealing; in the event the jury should return a verdict in favor of the plaintiffs, then by an appeal on the part of the defendants the Circuit Court might pass upon the question without the necessity of going to the expense of another trial.

"Mr. DeJarnette: Let's not compromise in our ruling. You have expressed the view that you do not think it should go to the jury. I feel that under those circumstances the verdict should be directed.

"The Court: I think so."

The sole question to be decided is whether there was sufficient proof of wilful or wanton misconduct on the part of the defendant to require submission of the case to the jury. One of the latest statements by this Court of the rule to be applied reads:

"On a motion for a directed verdict, it is the duty of the court to accept as true all the facts which the evidence tends to prove, and draw against the party making the motion all reasonable inferences most favorable to the party opposing the motion, and if the evidence is of such a character that reasonable men in an impartial exercise of their judgment may reach different conclusions, then the case should be submitted to the jury." Swift & Co. v. Morgan & Sturdivant, 5 Cir., 214 F.2d 115, 116.

See also Strawn v. Travelers Ins. Co., 5 Cir., 200 F.2d 778, 779, 780; Lowrie v. American Surety Co. of New York, 5 Cir., 146 F.2d 33, 35.

■■ Appellee insists that the rule to be applied in the federal courts is that a motion for directed verdict should be granted when "the evidence is clearly such that if a verdict were rendered for the adverse party, the moving party would be entitled to a new trial. Pennsylvania Railway Co. v. Chamberlain, 1933, 288 U.S. 333, 343 [53 S.Ct. 391],

77 L.Ed. 819; Daroca v. Metropolitan Life Insurance Co., 5 Cir., 1941, 121 F.2d 917." The authorities relied on by the appellee sustain its statement of the rule (see also Strawn v. Travelers Ins. Co., supra), though we think the word "entitled" should be emphasized, for it is now well settled that the rules to be applied as to the sufficiency of the evidence are different when the court is passing on a motion for directed verdict or for judgment n. o. v. on the one hand, and when it is passing on a motion for new trial on the other.[1] If the evidence is so clearly insufficient that the party against whom the verdict was rendered "would be entitled to a new trial", Pennsylvania Railway Co. v. Chamberlain, supra [288 U.S. 333, 53 S.Ct. 395], or that the judge "would be obliged to grant a new trial", Daroca v. Metropolitan Life Insurance Co., supra [121 F.2d 920], or "compelled to set aside a verdict", Strawn v. Travelers Ins. Co., supra [200 F.2d 779], then a denial of a motion for new trial would be an abuse of discretion, an error of law reviewable on appeal. See Whiteman v. Pitrie, 5 Cir., 220 F.2d 914, and authorities there cited. In less extreme cases, however, when the verdict is merely contrary to the preponderance of the evidence, or when the trial judge thinks the verdict is wrong though supported by some evidence, he may properly exercise his discretion in granting a new trial. Marsh v. Illinois Central R. Co., 5 Cir., 175 F.2d 498, 500; Pennsylvania Thresherman & Farmers' Mutual Casualty Ins. Co. v. Crapet, 5 Cir., 199 F.2d 850, 853; Snead v. New York Central R. Co., 4 Cir., 216 F.2d 169, 172, 175; 5 Moore's Federal Practice, 2nd ed., Para. 50.03.

Various formulas for ruling on a motion for directed verdict appear in the opinions of the Supreme Court, and one of the later cases has said that the matter is not greatly aided by substituting one general formula for another. Galloway v. United States, 319 U.S. 372, 395, 63 S.Ct. 1077, 87 L.Ed. 1458. The opinion in that case, along with the dissenting opinion of Mr. Justice Black, demonstrates the necessity of constant vigilance on the part of the lower federal courts lest the constitutional guaranty of jury trial be invaded. One of the latest expressions of the Supreme Court is simply that: "The requirement is for probative facts capable of supporting, with reason, the conclusion expressed in the verdict." Myers v. Reading Co., 331 U.S. 477, 485, 67 S.Ct. 1334, 1339, 91 L.Ed. 1615.

■ One thing on which all of the cases seem to agree is that it is the jury's province and not that of the judge to pass upon the credibility of the witnesses, except perhaps in an extreme case where the testimony is demonstrably false. Ewing's Lessee v. Burnet, 11 Pet. 41, 51, 9 L.Ed. 624; Baltimore & Ohio R. Co. v. Groeger, 266 U.S. 521, 524, 45 S.Ct. 169, 69 L.Ed. 419; Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 74 L.Ed. 720; Brady v. Southern R. Co., 320 U.S. 476, 479, 64 S.Ct. 232, 88 L.Ed. 239. The rule is thus stated in the last cited case:

"When the evidence is such that *without weighing the credibility of the witnesses* there can be but one reasonable conclusion as to the verdict, the court should determine the proceeding by non-suit, directed verdict or otherwise in accordance with the applicable practice without submission to the jury, or by judgment notwithstanding the verdict." (Emphasis supplied.) 320 U.S. at pages 479, 480, 64 S.Ct. at page 234.

■ In the present case, the testimony of the defendant's witnesses, who happened to be its employees,[2] if believed by the jury, would establish that the de-

---

[1] Howard v. Louisiana & A. R. Co., 5 Cir., 49 F.2d 571; Woodward v. Atlantic Coast Line R. Co.; 5 Cir., 57 F.2d 1019; Reid v. Maryland Cas. Co., 5 Cir., 63 F. 2d 10.

[2] By that, we mean no intimation of untruthfulness, but simply a matter proper for the jury's consideration.

fendant had been guilty of no fault whatever, certainly of no wilful or wanton misconduct. To require submission of the issue to the jury, it was not necessary that the testimony establish a wilful or intentional wrong but only that a jury case be made on the issue of wanton misconduct.

The opinion thus far was written by Judge Rives and the court is in complete agreement on the controlling principles as stated; this statement is therefore adopted by the majority of the court.

However, the remainder of the opinion runs counter to the views of Judge Rives, and is not concurred in by him.

There are numerous Alabama decisions as to what constitutes wanton negligence. In one of the recent pronouncements of the Alabama Supreme Court the subject is dealt with as follows:

"Be it understood that 'intentional injury' and 'wanton injury' are 'moral equivalents,' but 'their elements are different, and proof of the one would not suffice of proof of the other.' Birmingham Ry., Light & Power Co. v. Ryan, 148 Ala. 69, 41 So. 616; Alabama Great Southern R. Co. v. Ensley Transfer & Supply Co., 211 Ala. 298, 100 So. 342." Feore v. Trammel, 212 Ala. 325, 102 So. 529, 533.

Citing this case this court in Wunderlich v. Franklin, 5 Cir., 100 F.2d 164, 167, said:

"In defining wanton negligence, the Alabama courts emphasize the necessity that the lack of care and disregard of probable consequences be so great that, in its ethical aspects at least, it be analogous to a will or intention to produce the result. A clear distinction between willful and wanton injuries is maintained on the basis of distinct elements, but the cases do not lose sight of the fact that, in holding liability for wanton negligence, they are treating the wrongdoer as if he had actually intended the result."

The Feore case, supra, further says:

"It follows from the decisions that * * *; to, constitute wantonness, that the party charged, or his servant acting for him in the premises, was conscious of the conduct which caused the injury, and conscious, from his knowledge of the existing conditions, that injury would likely or probably result from his conduct or omission to act, and with reckless indifference to consequences he consciously and intentionally did the wrongful act or omitted to do or discharge some known duty in the premises which produced the injurious result declared for in the complaint. Shepard v. Louisville & N. R. Co., 200 Ala. 524, 76 So. 850; Alabama Power Co. v. Conine, 210 Ala. 320, 97 So. 791; Birmingham Ry., Light & Power Co. v. Cockrum, 179 Ala. 372, 60 So. 304."

Bearing in mind then that we are not here concerned with simple negligence (the appellants by contract waived any claim for negligence) and that to find wantonness there must be evidentiary facts upon which the jury could infer an ethical or moral wrong committed by agents of the appellee, we conclude that the trial court correctly held that, in the language of the Supreme Court in Myers v. Reading Co., supra, there was an absence of "probative facts capable of supporting, with reason" a jury verdict of wilful or wanton misconduct.

Omitting for the moment a discussion of the testimony of the witness Johnson, the following chronological statement of events was clearly proven. There was a steam locomotive and caboose on one of two tracks near the burned building. About 5:15 p. m. Duncan, the brakeman who had been sleeping in the caboose, was awakened by the smell of smoke; he went outside and saw a small fire between the caboose and locomotive; he put at least 20 buckets of water on the fire and thought he put it out; he then ate his supper and waited until some repairs were made on the engine which

then pulled up to the station at about 7:15; plaintiff Plank and a friend of his named Simmons, both of whom testified for the plaintiffs, were at Plank's shop, which was later burned, and saw someone putting water on the fire until they saw only smoke, and then they both went home. Simmons testified "Well, at that time it looked like they had it pretty well whipped. I don't remember seeing any smoke as I went away." Plank testified that he saw men who looked like railroad men putting water on a fire about 8 or 10 feet in circumference for 15 minutes or more before he went home, and that he left with Simmons, who testified it was then 6:15 or 6:20; that he saw no fire at that time. Thereafter, several witnesses saw a fire near the tracks and near the building at shortly after 7:00 o'clock, at about the time the locomotive and caboose moved; then one witness Embry testified that he went to the railroad station at about 7:30 to 8:00 p. m. and found the ticket agent trying to phone to get help to put out a fire that he had observed nearing the packing house; he testified that the agent said "that the switch engine had just dumped hot ashes several yards down the track and, of course, the grass had caught fire and it was burning to the packing house."

If this were all the testimony we think it clear that there is no evidence from which the jury could infer wantonness on the part of the railroad company. Here is evidence of two fires having two different origins. Proof of both of them was offered by appellants. The first, having been discovered by the railroad brakeman between 5:00 and 6:00 o'clock, was smothered by him so that not only did he think it was out but so that Plank, whose building was later destroyed, calmly went home, apparently confident of the same thing. The second was stated by the station agent between 7:30 and 8:00 o'clock to have "just" resulted from

the dumping of hot ashes. If this caused the fire, at any rate the station agent was trying to telephone for help as soon as he saw it, and there is no evidence that any other person knew that such a fire had been kindled by the locomotive. All of this evidence was either undisputed or offered by the plaintiffs. Surely there was no evidence of wanton misconduct here.

We have now to consider the testimony of the witness Johnson, who stated that he had been getting supplies out of the packing house and left about 5:30; he testified that he saw "some Coast Line employees," not otherwise identified, around a fire between the tracks, apparently cooking a meal;[3] they were there at 5:30 when he left. He said he came driving back down the road "a few minutes after six; sometime along there shortly after six"; he said he observed "some grass and weeds around there were burning, around the area where these fellows had been, where this cooking was." On further questioning by plaintiff's counsel as to whether he observed any men "by the fire as you came back there sometime after 6:00 o'clock," he said "they were around there." Asked how much fire there was shortly after six he said it was 12 or 15 feet wide.

Appellant contends that this testimony shows a continuation of the fire alleged to have been started by the railroad's employees into the fire later seen after seven o'clock in order to tie the appellant in with the theory that its employees casually stood by while the fire they had allegedly started spread to the grass and endangered the buildings.[4] There is no support in the evidence for such a contention. Giving full credit for truthfulness to Johnson's testimony that he saw a blaze a few minutes after six and saw two men around it, it is perfectly clear

---

3. Duncan, the brakeman on the caboose, categorically testified that no member of the crew cooked any meals on an open fire.

4. Appellants' contention in their brief that "Other witnesses testified that they observed the same fire in the same area from five o'clock in the afternoon continuously until it destroyed plaintiffs' property" is not supported in the record.

that this is the same blaze that Plank and Simmons saw and which they watched until 6:15 or 6:20, when it was quenched to their satisfaction and that of the train brakeman. There is no testimony that any railroad employee later saw any fire identified as a railroad kindled fire until the event related by Embrey at the ticket office. How could wantonness be attributed to the appellee railroad company for leaving the first fire if one of the plaintiffs who watched its progress was also satisfied that it was quenched?

To permit a jury to find wanton or wilful negligence from such a set of circumstances would be to permit rank speculation. It would destroy any distinction between ordinary and wanton negligence and permit a jury upon a *prima facie* showing of simple negligence to treat it equally as a *prima facie* showing of wantonness. Since two of plaintiffs' witnesses agree practically to the minute as to the small fire just after 6:00 o'clock and one of the plaintiffs himself testified that it was apparently out and his friend and co-watcher testified he did not even see any smoke after the action of the brakeman, it is evident that the court recognized the complete break in the evidence which would connect the 5:30 to 6:00 o'clock fire with that which between 7:30 and 8:00 o'clock destroyed the packing house. At the very least it would eliminate any basis in fact for an inference that, if it did later rekindle, there was any moral or ethical wrong committed by Duncan in not being aware of that possibility.

We think the trial court was clearly right in granting the appellee's motion for a directed verdict, since there is no direct evidence that the fire on the railroad tracks did in fact become the fire that destroyed the buildings. The extreme unlikelihood that it did so is emphasized by three of the plaintiffs' own witnesses. Two of them testified that to their satisfaction the railroad kindled fire appeared to be quenched and the other testified that the station agent attributed the destruction of the buildings

to a fire caused sometime after 7:00 o'clock by the dumping of hot ashes. While this is denied by the employee involved, we must take it as true, and, if so, then the plaintiffs must show some wanton misconduct after the dumping of the ashes. The only suggestion of negligence in this regard is the plaintiffs' complaint that the agent, instead of trying for several minutes to phone for help unsuccessfully, should have left his station and run somewhere for help. Such conduct would hardly amount even to ordinary negligence. It certainly does not permit the inference that it amounted to wilful or wanton misconduct. It was at worst the failure to exercise correct judgment.

The judgment is

Affirmed.

RIVES, Circuit Judge.

I dissent.

RIVES, Circuit Judge (dissenting).

Insofar as my learned brothers apply familiar and well settled principles so as to reach the stated conclusion that this record contains no testimony of "probative facts capable of supporting, with reason," a jury verdict of willful or wanton misconduct, I must respectfully disagree. It seems to me that in reaching that conclusion they obviously evaluate the credibility of, and in fact necessarily reject as unworthy of belief, contrary testimony and plausible inferences therefrom, as to the origin and progress of the fire, some of which was given by appellee's own witnesses, and which fairly required submission.

The majority's apparent adoption of appellee's theory that there were two separate and distinct fires, and their further assumption that the first fire discovered by appellee's brakeman, Duncan, between 5:00 and 6:00 P.M. "was smothered by him," seem to me unjustified on the basis of this record, particularly in view of Duncan's candid admission even on direct examination by appellee's counsel that *he merely thought* he extin-

guished the first fire.[1] And while appellants' testimony may not positively identify and connect up chronologically the first 6:00 P. M. fire as identical with that which admittedly destroyed their property between 7:30 and 8:00 P. M., with deference I submit that the testimony, as well as the surrounding physical facts and time element involved, at least created a strong inference for the jury that the fire ultimately causing the damage was but a continuation of the fire which Johnson testified he had observed approximately an hour earlier being used for cooking purposes by appellee's employees.

Johnson testified that he first observed the fire from "shortly after five" until "somewhere around five-thirty," when he left the packing house, and again upon his return "a few minutes after six." Warren testified that he first noticed the fire "something after six o'clock" and again at 7 P. M., "or a little after" in "approximately the same place" where he had seen the previous fire, and that at that time he saw appellee's train leaving the Lake Harbor station with the fire still burning. Crouch testified that he first saw the fire at about 7:05 P. M., shortly after he arrived home, and that when he got to the scene "there was nobody around the fire," which was then "at the far end of the packing house," and that "the train, a car and the engine, had just cleared the crossing." Hoskins, the brakeman on appellee's train crew, testified by deposition that he first observed the fire in the maiden cane "blowing across the track * * * at an angle" toward the packing house between 6:00 and 7:00 P. M., and that he "did not do anything" or turn in any alarm because he assumed someone else had done so and wanted to get back to his work. Revels first noticed the fire, according to his testimony, around 7 o'clock, at which time it was in the maiden cane "probably 75 or 100 feet from the packing house," and stated that when he drove away he "looked back * * * to see if they had gotten the fire out" and could still see it burning in "the same place", though appellee's train had just departed. Finally, Embry testified by deposition that he saw the fire at about 7:30 P. M., at which time it was burning about "50 to 75 feet from the packing house."

In view of all the foregoing and other testimony, the majority's conclusion that there exists a "complete break" in the testimony connecting "the 5:30 to 6:00 o'clock fire with that which between 7:30 and 8:00 o'clock destroyed the packing house," seems to me unjustified, and simply an invasion of the jury's province by drawing inferences adverse to parties against whom a verdict has been directed. Viewing the testimony most favorably to appellants, as here we must, it seems to me that reasonable and fair-minded jurors quite justifiably might have concluded from all the testimony and reasonable inferences that the fire which ultimately destroyed appellants' property was started by appellee's employees;[2] that it was recklessly left

---

1. Actually, Duncan testified:
    "Q. When you finished putting water on that fire will you tell us whether or not there was any fire left?
    "A. I wouldn't say there was any fire left, because I wouldn't know, but I don't believe there was any fire left at all.
    "Q. Was there any smoke left?
    "A. There was some smoke there, yes, sir.
    "Q. At the time you were putting it out, I suppose it was your purpose to use the water to put it out; is that right?
    "A. That is right, yes, sir.
    "Q. What is your belief as to whether you put that fire out?

"A. I believe I put it out. Of course, like I am telling you, you don't know whether you put a muck fire out or not."

2. Johnson testified:
    "Q. Will you tell the Court and jury, Mr. Johnson, just what these railroad employees were doing and just where they were located? A. Well, they were located just a little bit in front of the caboose, between the tracks, between the two tracks.
    *   *   *   *   *
    "Q. What were they doing? A. Well, they had a fire there under some kind of a grill of some sort and a coffee pot, and what looked to be a skillet of some

unattended in either a burning or smouldering condition by appellee's train crew when they departed sometime thereafter; [3] that appellee's crew well knew, as evidenced by Duncan's testimony, footnote (1), supra, that a "muck fire" was difficult to put out and, if left unattended, might easily re-ignite the dry grass and maiden cane surrounding appellants' property, particularly with even a "little breeze blowing"; [4] and that, with knowledge of appellants' property thus imperiled by their own acts, they took no positive action to fully extinguish any remaining embers, but even departed leaving it unattended, and, insofar as this record reveals, without informing appellants, as nearby property owners, or anyone else, of the possibility of its recurrence.

description. They were going about there as though they were preparing something to cook.

"Q. About what time in the afternoon would you say that was? A. That was shortly after five.

"Q. This fire, you say this fire was under this sort of grate thing? A. Sort of a grill.

"Q. Was it on the ground or in some sort of a container, or what? A. The fire was on the ground.

"Q. Was the coffee pot and the skillet over the fire? A. On the grill, yes, sir.

"Q. About what time of the day did you leave the packing house there, Mr. Johnson? A. Well, somewhere around five-thirty.

"Q. Did you have occasion to observe the men (sic) as you left the packing house at five-thirty, the men over there? A. Well, yes, they were still there."

Johnson further identified that same fire on his return trip "shortly after six" as the fire which he had previously seen being used by appellee's employees, as follows:

"Q. What did you observe as you came up by the tracks there? A. Well, there was some grass and weeds around there that were burning, around the area where these fellows had been, where the cooking was.

"Q. In other words, there was a fire in the area where you saw the men cooking is that correct? A. Yes, sir.

"Q. Approximately how wide would you say the fire was? Could you tell from there? A. Oh, maybe twelve or fifteen feet.

"Q. How many men did you see over by the grill at between five and five-thirty when you went over there? A. Two.

"Q. Did you observe any men over by the fire as you came by there sometime after six o'clock? A. They were around there.

"Q. They were around there? A. Around the fire, yes, sir."

3. Appellee's own employee, Warren, testified:

"Q. In other words, when the train moved out you looked and saw the fire; is that right?

"A. That is right.

"Q. Was that fire approximately the same place where you saw the fire about six o'clock?

"A. Yes."

Also, the witness Crouch testified that appellee's train and crew had "just cleared the crossing" when the fire which destroyed appellants' property really broke out, and the witness Revels further testified:

"Q. Where was this fire with reference to the fire that you saw when you went by there?

"A. It was the same place.

"Q. As I understand, you saw the train pull out?

"A. Yes, sir."

4. The witness, Guy Bender, testified:

"Q. If the fire is actually in the muck and there remains, we will say, after the extinguishment of the blaze from a grass fire a smouldering condition, would you have any opinion as to whether that smouldering condition could ignite at a subsequent time and cause a rising of the fire?

"A. Maiden cane is very easy to re-ignite. The roots of the maiden cane will smoulder a little, and a little breeze will pick it up and it will re-ignite into a blaze very rapidly. Even after you extinguish the top fire if you don't continue to wet it down and watch it, it will re-ignite very easily in the maiden cane roots."

The witness Embry further testified:

"Q. How big a fire was burning?

"A. It was a pretty good field of fire. In other words, the grass was high and the wind was blowing, and it was spreading fast.

"Q. Did it look like a grass fire.

"A. Yes, you could see it was a grass fire.

"Q. In what direction was the wind blowing.

"A. Unfortunately, it was blowing and just pushing it right on in to the packing house. It wasn't losing any time getting there."

To my way of thinking, all of the foregoing testimony certainly constitutes "probative facts capable of supporting, with reason," a jury verdict of willful or wanton misconduct, Myers v. Reading Co., supra [331 U.S. 477, 67 S.Ct. 1339], and proof from which the jury might reasonably have inferred "an ethical or moral wrong committed by agents of the appellee." The majority, however, say that it does not, but to add a favorite quotation of that master of the apt phrase, the late Mr. Justice Jackson, " 'The more (they) explain it, the more I don't understand it.' " Securities and Exchange Commission v. Chenery Corp., 332 U.S. 194, at page 214, 67 S.Ct. 1575, 1762, 91 L.Ed. 1995. Somewhat facetiously, I might add that, if appellee's main theory as to the extinction of the first fire be accepted, this is probably the only fire known that may well have burned appellants' property after it had been completely "smothered."

The majority suggestion that wantonness should not be attributed to appellee's agents from the testimony as to the origin and supposed extinction of the first fire, merely because appellant Plank departed from the warehouse area allegedly after himself being "satisfied that it was quenched," seems to me a purely speculative and unwarranted assumption under this record. Certainly, that argument is hardly referable to restrict any right of recovery which might have been found by the jury to exist in favor of appellant Thomas, and its effect, if any, as a probative fact tending to negative wantonness, was at most a minor circumstance for the jury's consideration in resolving the basic issue of wanton misconduct. I actually find no testimony or inferences one way or the other in this record that Plank departed from the warehouse so satisfied,[5] but conceding arguendo that he did, it seems to me that a jury would still have been justified in making a finding of wanton misconduct, if they believed that Plank was justified, from all the proven facts and circumstances, in assuming that appellee's train crew would not recklessly depart the warehouse area without notification to him or someone else that they were leaving unattended a smouldering condition for which they were responsible, so as to imperil his property. In any event, to draw such an adverse inference merely from Plank's departure does not appear warranted in view of the undisputed fact that Thomas owned the packing house and Plank's sublease of a small, open lean-to shed "on the east end" hardly justified any grave apprehension on his part as to the safety of the property.

Furthermore, though I regard the testimony as to the damage having actually been caused by the first fire as more credible,[6] I still doubt whether the majority is justified in holding that no wanton misconduct could reasonably have been found by the jury under appellee's theory that a second and subsequent fire actually caused the damage. I would not belabor this point, for regardless of whether the fire which de-

---

5. Actually, appellant Plank did not testify that the first fire "was apparently out" when he departed, but only as follows:

"Q. At the time that you got into your car and the time you drove away did you again look back to see what the men were doing? A. Yes, sir. As I crossed the railroad at the depot I looked back down the track and they were carrying water from the tender.

"Q. They were still carrying water? A. Still carrying water.

"Q. As far as any fire or smoke at that time, did you observe any fire or smoke at that time?

\* \* \* \* \*

"Q. Are you certain that those men were still carrying water over to this area where the fire had been when you crossed the track there and looked back? A. Yes, sir.

"Q. Did you later learn that there was a fire at the packing house or the packing house had caught afire? A. Yes, sir."

6. The only testimony as to the existence of the "second fire" was that from the witness, T. P. Embry, quoted by the majority, and though unobjected to, it was pure hearsay. Moreover, its existence at any time was vigorously disputed by appellee's own employee-witnesses.

stroyed appellants' property was the "first fire" observed by the witness Johnson, or the "second fire" caused by appellee's engine having discharged hot coals on the track, as revealed by the testimony of Embry, there is still direct testimony in this record as to the existence of a fire, caused in one way or the other by appellee's servants, dangerously near appellants' property, from about 5:30 P.M. almost continuously until approximately 7:30 P. M. when the property was destroyed.[7]

All of the above detailed factual argument, both by the majority and myself, as to the sufficiency of the evidence on the issue of wantonness, is simply illustrative of the inherent impracticability of appellate courts attempting to resolve, through infinitely varying interpretations, ultimate factual issues and inferences from conflicting and equivocal testimony. Every factual argument here invoked could more appropriately have been addressed to a jury below. The basic difficulty in close cases is that varying interpretations result not so much from a literal reading of the testimony, as from the inferences "reasonably" to be drawn therefrom. But it is not a court's province to draw or weigh inferences for a jury any more than it is its privilege to resolve direct testimonial conflicts. See Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 68, 63 S.Ct. 444, 87 L.Ed. 610; Tennant v. Peoria & P. U. R. Co., 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520. While I agree with my brothers that a jury's speculation and conjecture as to wantonness may not be permitted, in the absence of probative proof tending to reveal its existence, I think they mistakenly assume there must be "direct evidence" of wantonness in order to justify submission. Surely a *prima facie* showing of wantonness above and beyond simple negligence may reasonably be inferred from all the probative facts and circumstances here proved. The Supreme Court has itself upheld direction of a verdict only after giving "full credence to all of the testimony" and "making due allowance for all reasonably possible inferences favoring the party whose case is attacked." Cf. Galloway v. United States, 319 U.S. 372, 395, 396, 63 S.Ct. 1077, 1090, 87 L.Ed. 1458. And, as Mr. Justice Black there observed, "the judges of the District Courts and the Circuit Courts of Appeal are the primary custodians of the (Seventh) Amendment", and have almost the entire responsibility of insuring compliance with the rule that a verdict is directed "only when, *without weighing the credibility of the witnesses,* there is in the evidence no room whatever for honest difference of opinion over the factual issue in controversy." Galloway v. United States, supra, at page 407, 63 S.Ct. at page 1096, Black, J., dissenting.

I confess an abiding conviction that the right to a jury trial is one of the great bulwarks of our constitutional system, and can only view with alarm the ever present tendency of both trial and appellate courts inadvertently to deprive some litigants of this constitutionally guaranteed right, simply because of our fallible human tendency to reject, by means of subjective rather than objective analysis, sworn testimony which, as individuals, we do not consider worthy of belief. See Lavender v. Kurn, 327 U.S. 645, 653, 66 S.Ct. 740, 90 L.Ed. 916.

I respectfully dissent.

---

7. While there may be no testimony that "any railroad employee" later observed any fire "identified as a railroad kindled fire" subsequent to that fire originally observed by the witness Johnson at 5:30 P.M., certainly the record contains testimony of other witnesses that, except possibly for a lapse of some 30 to 40 minutes between 6:15 and shortly before 7 P.M., during which time the previous fire may well have been smouldering in the maiden cane, a fire was almost continuously observed in the packing house area.