**INLAND CONTAINER CORPORATION,**
Appellant,

v.

**ATLANTIC COAST LINE RAILROAD
COMPANY, Appellee.**

No. 17576.

United States Court of Appeals
Fifth Circuit.

May 13, 1959.

Rehearing Denied June 10, 1959.

William M. Howell, Jacksonville, Fla., Howell & Kirby, Jacksonville, Fla., of counsel, for appellant.

Clark W. Toole, Jr., Louis Kurz, Kurz & Toole, Jacksonville, Fla., for appellee.

Before TUTTLE, CAMERON and WISDOM, Circuit Judges.

TUTTLE, Circuit Judge.

This is an appeal from a judgment based on a directed verdict for appellee, suing to recover for the amount of a judgment it had been required to pay for the death of its employee. The suit was on an indemnity agreement executed by the appellant as an inducement for appellee railroad to construct its side tracks closer than safety would dictate to the side of appellant's building. The case is to be decided on the basis of Florida law.

During the latter part of 1955, the Inland Container Corporation built a new plant, in pursuing its business as manufacturer of corrugated containers and certain other paper products, and applied for and obtained an order of the Florida Railroad and Public Utilities Commission authorizing construction of this plant at less than standard clearance at a sidetrack or spur track of about 1,000 feet in length; that is, from a point in the center of the track between the rails to the building, the distance of five feet, ten inches, as compared with a standard clearance of eight feet, six inches, or a little more. The practical effect of this was that there was not room on the side of a car being spotted at the industry's building and the building itself to clear a man if that man should be riding or positioned on the side of the box car closest to the building, this distance being merely some six to eight inches.

The pertinent paragraph of the side-track agreement, specifically, Paragraph 11, reads as follows:

"Notwithstanding any other provisions herein, it is understood and agreed that the said building is located and maintained by the industry at substandard clearance as shown on attached blueprints between points 'AA' and 'BB'. By reason of the additional hazard created thereby the Industry shall and does hereby assume entire responsibility for all damage to property or injury to or death of any person or persons including, but not limited to the employees of the Railroad, caused by or in any manner arising out of the presence or use of said building at substandard clearance, whether caused by negligence of the Railroad or howsoever resulting, and the Industry further agrees to indemnify and save harmless against all loss, damages, claims, suits or judgments resulting from or arising out of damage, injury or death as aforesaid."

The following statement of appellant's case, stated most favorably to it, is taken almost verbatim from its brief. Some additional statements are made where appellant has omitted significant undisputed items:

On June 23, 1956, Joel Edwin McGill was employed by the railroad as a brakeman. He was working under Conductor W. W. Culp on a through freight train between Sanford and Tampa, Florida. They were to spot a certain box car at the Inland Container Corporation plant at Pinecastle, which is about five miles south of Orlando, and the particular car to be spotted was immediately behind the engine, in a train containing forty-four other freight cars. Their direction and progress was south. When they reached Pinecastle and the vicinity of this industry, the train crew detached the car to be spotted from the remainder of the train and jerked it into the side track by means of a flying switch, that is, the brakeman rode the

car and as they approached the switch point leading into the industry, the car was uncoupled from the engine, a signal given and the engine speeded up, went on past the switch away from the rolling box car in a southerly direction, then the conductor threw the switch which allowed the box car to roll into the side track and toward the building. Instead of stopping on the side track past the switch point, this particular box car continued to roll on down the track, although brakeman McGill was turning the hand brake wheel in an apparent effort to get the car stopped; nevertheless, the speed was not retarded and the car traveled between seven hundred and eight hundred feet before it reached the northeast corner of the building. When McGill was about twenty feet from the building, he attempted to go down the ladder on the right hand side of the leading end of the rolling box car but, because of that short distance, only twenty feet, and the speed of the car, he succeeded in getting only two or three rungs down the ladder when it reached the building and he was crushed between the side of the car and the building and he died. Meanwhile, the offending box car continued to roll down the track adjacent to the building for some two hundred feet, crashed over some cross ties which were placed there at the dead end of the track and into some concrete steps reinforced with steel, knocking them down.

The track had a slightly descending grade toward the building and a "normal" speed for switching in situations where a flying switch was executed would be 4 m. p. h. The speed when it left the track was about 3 m. p. h. When it reached the end of the track it may have been going as much as 7–10 m. p. h.

Trainmaster Beach, who was called by the defendant under the adverse witness rule, stated that although in certain situations it was common practice "to jerk cars by into tracks when conditions are favorable, we usually shove the car in if it's possible to do so." There was a "team track" a quarter of a mile north of the Inland Container track—and which, therefore, had already been traversed by this train crew before reaching the industry—and "that side track could be used to get the engine behind the car." The train crew considered the matter of how to place this car and concluded the way used was appropriate.

This substandard clearance was known by both parties to be dangerous and hazardous. The railroad had issued a bulletin, No. 5566, dated November 7, 1955, which announced the opening of this side track and treated, in a separate paragraph, the dangerous aspects by saying, "Note: This track will not clear man on side of car." And a subsequent bulletin, No. 5589 dated November 14, 1955, likewise called attention to the close clearance, and there was a compulsory duty on each of the employees to read and sign these bulletins. The conductor, Culp, according to these exhibits, did sign both bulletins, but McGill signed only the second one, and it is considered a dereliction of duty if an employee does not sign this type of bulletin. Culp did not warn McGill, as indicated by the following question and answer:

"Q. Prior to drifting Southern 1220 into the Inland Container track, had you cautioned Brakeman McGill about close clearance at the building? A. No, sir, I hadn't, as I wasn't any more familiar with the clearance than he was."

There was evidence that the railroad was guilty of violation of the Safety Appliance Act in that the car was not equipped with efficient handbrakes as required by that Act. The accident report submitted by the engineer and conductor showed that McGill was riding the lead end of the car to handle the hand brakes and "apparently Trainman McGill was unable to stop car with hand brakes."

McGill's estate sued the railroad, which, in an agreed judgment admitted by appellant to be fair, paid a judgment of some $50,000. This, plus ex-

penses and interest, is the amount sued for under the indemnity agreement. The Container Corporation defended the action on the ground that the injury to McGill was caused by "wilful or wanton negligence" and that the indemnity agreement could not protect against such conduct of a railroad.

In the absence of any Florida case touching on this point, we are controlled by this Court's decisions in Thomas v. Atlantic Coast Line R. Co., 5 Cir., 201 F.2d 167, and Thomas v. Atlantic Coast Line R. Co., 5 Cir., 223 F. 2d 1. In those cases, arising in Florida, it was decided "if the * * * agreement did propose to exempt the railroad from liability for the consequences of a willful breach of duty it would, to that extent, be illegal," [201 F.2d 170.] and further that "to find wantonness there must be evidentiary facts upon which the jury could infer an ethical or moral wrong committed by agents of the [railroad]." [223 F.2d 5.] In the second Thomas case we rejected the idea that a jury, upon a prima facie showing of simple negligence, could treat it as a prima facie showing of wantonness.

Since we are dealing here with the kind of conduct which imports such callous or wilful disregard of the rights of others as to make an indemnity agreement relating to it too shocking to be permitted under an enlightened public policy, we do not find much guidance from Florida cases discussing gross negligence, or even equating gross negligence with wanton conduct. This is so because no Florida case, so far as we have been able to find, has said a contract of indemnity entered into by a railroad is void as being against public policy if sought to be invoked in a case where mere gross negligence has been shown. They deal principally with the automobile guest statute. The only cases establishing the outer limits of a valid contract of indemnity against negligence are the two federal court cases cited above.

Viewed from the standpoint of the railroad, whose wantonness or wilfulness is on trial, we agree with the trial court. We cannot say that there is any evidence from which a jury could infer such moral fault as would make the railroad's contract of indemnity against this loss offend public policy. It had, without dispute, notified the deceased brakeman of the very danger that ultimately brought about his death. He had acknowledged notice of this danger in writing. He was not, therefore, shunted out onto this track in ignorance of the dangerous consequences of a failure to be alert. The railroad had furnished him a platform at the forward end of the car from which he could turn the brake; the operation was a normal one, and though, because of the apparent failure of the brake to work the car may have picked up speed of 10 miles per hour, there is no evidence that it left the main line at more than 3–4 miles per hour conceded by the appellant to be normal; there was no evidence from which a jury could find that the conductor had an opportunity to warn McGill after he knew the car would not stop, or that the conductor had any reason to believe that as McGill approached the building he would not take a safe position either on the left ladder or the front ladder, rather than attempt to climb down the right hand ladder just as he approached the building.

If we are required to consider the conduct of McGill himself as imputing wanton negligence or wilfulness to the railroad, which we do not decide, there is nothing in McGill's action in starting to climb down the ladder on the right side that shows more than either forgetfulness of the true conditions or carelessness arising out of long habit of assuming that wherever there is a side track there is ample clearance for a man on the side of the car. His negligent conduct cannot be blown up to constitute wanton or wilful disregard of his own safety.

■ Finally it is asserted by appellant that the jury could have found that the brake was defective, and that there would thus be liability for injury under the Federal Safety Appliance Act, 45 U.S.C.A. § 1. Thus, it is said, this contract was void insofar as it sought to indemnify the railroad for its own violation of the Safety Appliance Act. This contention was belatedly made by appellant in a motion to amend its answer filed three days before trial. It was set up as a sixth defense. The trial court overruled the motion. We cannot say that this was error. Moreover, had the amendment permitted this defense to be raised, we think it would not avail the appellant anything. We have heretofore held in Chicago & N. W. Ry. Co. v. Davenport, 5 Cir., 205 F.2d 589, 594, that such a contract is not void. There is no Florida rule on this phase of the matter. Any such contention must therefore depend upon the Safety Appliance Act itself. In rejecting such a contention in the Davenport case we said:

"We are not able to follow the learned district judge in holding that, so construed, this is a contract by which the Railroad seeks to exempt itself from liability created by the Federal Employers' Liability Act or the Federal Safety Appliance Act and, hence, void under 45 U.S.C.A. § 55. The Railroad did not seek to escape liability to its employee. To the contrary, it settled with him fairly and honorably. The contract, construed as contended for by Appellant Railroad, seems to us to provide for indemnification and not for a limitation of liability. See Sager v. Northern Pac. Ry. Co., C.C., 166 F. 526; Sinclair Refining Co. v. Stevens, 8 Cir., 123 F.2d 186; Cacey v. Virginian Ry. Co., 4 Cir., 85 F.2d 976; Northern Pac. Ry. Co. v. Thornton Bros. Co., 206 Minn. 193, 288 N.W. 226; Gaulden v. Southern Pac. Co., D.C.N.D.Calif., 78 F.Supp. 651, 655, 656, affirmed 9 Cir., 174 F.2d 1022. We quote from the case last cited:

" 'It is suggested that the so-called indemnity clause of the Protective Service Contract amounts to a violation of Section 5. But inasmuch as this clause is one merely of indemnity, it does not have the effect of exempting the railroads from their liability as common carriers under the Act. Hence in no sense may it be considered a violation of Section 5.' "

■ We think that under the law of Florida which is here invoked by appellant, there was no evidence introduced from which the jury could properly infer wantonness or wilfulness of the appellee as would make its agreement of indemnity with appellant, when invoked here, offend any public policy of the state. The obligation entered into by appellant was intended to cover just such possible injuries as here occurred. The unsafe condition was of its own making. There is still in Florida a strong adherence to the common law principle of the freedom of contract, Thomas v. Atlantic Coast Line R. Co., 5 Cir., 201 F.2d 167, 169.

"A contract is not void, as against public policy unless it is injurious to the interests of the public, or contravenes some established interest of society." Atlantic Coast Line R. Co. v. Beazley, 54 Fla. 311, 45 So. 761, 762.

Where two business organizations of comparable bargaining power seek to measure their mutual legal responsibilities by contract in a way that comports with ordinary business practices, the courts should not strain to find for either of them a way out of its contract.

The judgment is affirmed.