Mrs. Lillian **CATHELINE**, Plaintiff,

v.

**SEABOARD COAST LINE RAILROAD COMPANY**, Defendant.

**Civ. No. 70–26.**

United States District Court,
M. D. Florida,
Orlando Division.

April 12, 1972.

Karl O. Koepke, Whitaker and Koepke & Assoc., Orlando, Fla., William B. O'Connell, Jr., Arlington, Va., for plaintiff.

Frederick J. Ward, Giles, Hedrick & Robinson, Orlando, Fla., for defendant.

## OPINION AND ORDER

WILLIAM A. McRAE, Jr., Chief Judge.

Plaintiff instituted this suit to recover damages for injuries alleged to have been sustained by her while a passenger on one of two of defendant's trains which collided on August 5, 1968. There having been no demand for a jury trial, the issues were put before the Court to be determined on the basis of facts set forth in a stipulation signed by counsel for both parties.

Plaintiff, wife of a conductor for the Penn Central Railroad Company, was traveling on a "Trip Pass" issued by defendant by virtue of her husband's employment. The back of the pass contained a statement that

> [t]he person accepting this free ticket agrees that the Seaboard Coast Line Railroad Company shall not be liable, under any circumstances, whether of negligence of agents, or otherwise, for any injury to the person, or for any loss or damage to the property of the passenger using the same.

██ Both parties agree that federal law governs the liability of an interstate carrier to one injured while traveling on a free pass, Kansas City So. Ry. Co. v. Van Zant, 260 U.S. 459, 43 S.Ct. 176, 67 L.Ed. 348 (1923), and that provisions appearing on such passes can absolve the carrier of liability for ordinary negligence. Francis v. Southern Pacific Co., 333 U.S. 445, 68 S.Ct. 611, 92 L.Ed. 798 (1948); Northern Pacific R. Co. v. Adams, 192 U.S. 440, 24 S.Ct. 408, 48 L.Ed. 513 (1904). It is also clear, however, that such provisions cannot relieve the carrier of liability for injuries resulting from its wilful or wanton misconduct. New York Central R. Co. v. Mohney, 252 U.S. 152, 40 S.Ct. 287, 64 L.Ed. 502 (1920).

██ The parties are also agreed, therefore, that plaintiff may not recover if the facts demonstrate no more than ordinary negligence. This harmonious accord disappears, however, when attention is directed to the precise standard distinguishing such mere negligence from conduct which would justify recovery. The exact nature of wanton and wilful misbehavior has been a subject of

continuing debate, yielding conclusions as disparate as they are creative. An effort seemingly on the right track, is contained in the Restatement:

### § 500. *Reckless Disregard of Safety Defined*

The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent. (Restatement, Second, Torts § 500.)*

This wording, formulated by the American Law Institute after considerable study, has several significant characteristics, including that of heavy reliance upon an objective standard. Subjective inquiries into "intention" appear relevant only where it is necessary to establish cognitive omission of a duty-bound act; a rebuttable presumption of intent apparently surrounds commission. Once it appears that the specific act or omission was conscious, the test calls for an *objective* assessment of whether, assuming a lack of *actual* knowledge, a reasonable man would have known that this conduct created a risk of physical harm to another, substantially greater in dimension than that necessary to render the conduct negligent.

The Restatement does not require a showing that the actor *himself* exercised enough intelligence to recognize the potential for harm resulting from his conduct. It is enough that he *should have* realized it drawing from facts whose availability would have put a "due care" man on notice *not only* that there was an unreasonable risk of harm to another —but that its probability was alarmingly high. This objective approach not only saves the plaintiff from having to jerk the main course of his case through the teeth of the adverse party, but also helps assure uniform results in similar factual situations by disregarding the perceptual acuity of the tortfeasor.

In Evens v. Texas Pacific-Missouri Pacific Terminal R., 134 F.2d 275 (5th Cir. 1943), the Fifth Circuit gave implied approval to the objective standard set forth in the first Restatement, (134 F.2d at 276, fn. 2; Restatement cited), which is identical in substance to the second. See Restatement, Second, Torts Appendix § 500, Reporter's Notes. The precise nature of the ruling in that case is perplexing, however, in that the majority opinion also states a wholly subjective test:

[w]anton negligence may be generally defined as an act (or failure to act when there is a duty to act) in reckless disregard of the rights of another, *coupled with a consciousness that injury is a probable consequence of the act or omission.* (134 F.2d at 276.) [Emphasis added.]

Without distinguishing the two tests, the court found the railroad guilty of wanton negligence, in that its employee had injured the plaintiff with "reckless indifference for [her] safety . . .," and "in full awareness of her peril." (at 277.) In view of the record before the court, however, it seems clear that this projection of the employee's mental state could only have been based upon an objective analysis of the circumstances of the incident. A dissenting opinion highlighted this point, but did so with equal internal inconsistency. The dissenter quoted the Restatement standard *verbatim,* but declined to apply the "having reason to know" clause by insisting

* This standard is accompanied by a "Special Note" stating:
"The conduct described in this Section is often called 'wilful and wanton misconduct' both in statutes and judicial opinions. On the other hand, this phrase is sometimes used by courts to refer to conduct intended to cause harm to another."

that the actor's own perception was determinative:

> . . . there is an entire absence of evidence upon which a jury could found a verdict of wantonness on [the employee's] part, that is, *that conscious that Mrs. Evans was in danger from his actions,* [he], *with reckless disregard of the consequences,* pushed the buggy against her, and the burden was on the plaintiff to prove this. (at 279,) [Emphasis by the court.]

In short, both the majority and dissenting opinions approved mutually inconsistent objective ("having reason to know") and subjective ("coupled with a consciousness") standards. Then, on a record apparently revealing "wantonness" only through the objective assessment, the court paradoxically divided over findings as to the *actual* state of the actor's mind.

The distinction between the Restatement's standard for wilful and wanton conduct, and the more restrictive rule requiring actual consciousness of probable injury, appears determinative in the case at bar. The stipulation, though sketchy and at points ambiguous, contains facts suggesting shortcomings by several of defendant's employees, none of which amounts to more than ordinary negligence—with one remarkable exception. The stipulation indicates, as have the parties in oral argument, that the heart of the controversy is the quite singular performance of the engineer of defendant's northbound train. His was an exceptional afternoon. While operating the vehicle just after high noon on a clear day in southern Florida, he piled headlong into a southbound train which was standing still, with its headlight burning, on a stretch of straight track over eight miles long. In consummating this unique collision he also trucked past two separate sets of warning signals, each of which indicated that danger might lie ahead, and incorrigibly maintained an optimistic outlook until the impact was inevitable.

The first relevant signal passed by northbound No. 58, the "distant warning signal," was situated some 10,000 feet south of the Winter Haven sidetrack, immediately north of which was the southbound No. 57, standing absolutely still. Under the existing conditions, this signal should have shown yellow over red, requiring the engineer to slow from his actual speed of 79 m.p.h. to 40 m.p.h., and to be prepared to stop *before* passing the next signal. Although post-wreck tests by the defendant railroad showed the signal to be functioning properly, the engineer claimed it had shown yellow over green when he passed, which, even if true, would require *him to slow the train to 30 m.p.h. and proceed "subject to any changes in the next signal."* (Stipulation, p. 3; emphasis added.) Surprisingly, there is no indication in the stipulation of what immediate response, if any, the engineer made to this first warning signal; it appears only that "as he approached the Winter Haven siding he made reductions in speed." (Stipulation, p. 4.) In any event, by his own account he was on notice that this train's progress was entirely subject to the reading of the next signal.

From a fair assessment of the unfortunately vague designations on pages 2 and 3 of the stipulation, it appears that this second beacon, known as the "home signal," was at the Winter Haven siding about 500 feet south of train No. 57. Under the existing conditions it was designed to display—and on the basis of a stipulated post-wreck photograph, the Court finds it did display—red over red, dictating an immediate stop to northbound traffic. By his account, this fact was lost on the engineer, who "contended he was unable to adequately see the home signal . . . as a result of the improper positioning of at least part of that signal and what he believed to be glare that interferred (sic) with his vision." (Stipulation, p. 3.) Assuming even this to be true, however, a decision by a train operator to proceed past a signal he has not read remains clearly irresponsible, if not reckless, in light of the dimensions of the instrumentality he

was controlling and the number of lives in his hands. In this case, the gravity of the error was aggravated by the proximity of both another train and a switching junction, either of which could have posed a threat reflected by the passed beacon, and was further compounded by the engineer's disregard of his own reading of the distant warning signal. Yet however unlikely his decision to proceed might strike the objective viewer, nowhere in the stipulation is there evidence that the engineer actually held "a consciousness that injury was a probable consequence" of his decision. The stipulation notes instead his contention that he believed train No. 57 to be on the sidetrack, as he asserts was the custom. The stipulation also states, however, that the headlight of No. 57 was visible over 1½ miles downtrack, and given broad daylight the engineer did eventually conclude that both trains were on the main track. Nonetheless, his wholly subjective report of his perceptions before impact show his flexible thinking to have been the positive equal of his continuing elections to push on; he next asserts he adopted the assumption that *his* train would go onto the sidetrack, custom to the contrary notwithstanding. The result of this series of misconceptions and improbable decisions, in the face of compelling evidence of grave danger and obvious high risk, is now a history which includes personal injury to the plaintiff.

The facts before the Court, then, point up the drawbacks to a purely "subjective" determination of wanton and wilful misconduct. However incomprehensible the actor's behavior, and however great the risk apparent to the eye of a reasonable observer, no liability would attach so long as the conduct involved oblivion or incredulity on his part, rather than an awareness of the probable harm. Even if the engineer had visualized both that the other train was dead ahead and that no switch would divert his own, no liability would attach under a wholly subjective test if he could honestly state that he proceeded because "I just couldn't believe my eyes." As noted above, thorough analysis of the problems of proof, of inconsistent outcomes, and of underlying rationale led the ALI to provide an alternative to the requirement that the actor himself grasp the extreme risk, for

[h]is inability to realize the danger may be due to his own reckless temperament, or to the abnormally favorable results of previous conduct of the same sort. (Restatement, Second, Torts § 500, Comment c.)

The fact that federal law controls the efficacy of pass provisions such as the one before this Court, together with the multi-state contacts of most railroads and the interstate itineraries of many passengers, makes it likely that a uniform Federal standard may eventually determine wilful and wanton behavior. Possible indications of Supreme Court predilections on the question may lie in *New York Central*, supra, where the standing train on which the plaintiff was a passenger was hit from behind by a train which, as in the instant case, had passed two block signals indicating danger ahead. Though the Supreme Court declined to weigh the evidence as to whether there had been wanton and wilful negligence, it indicated that any finding that there was no evidence of such in the record "cannot be sustained." (252 U.S. at 157, 40 S.Ct. 287, 64 L. Ed. 502.)

The Fifth Circuit case closest to the instant fact situation seems to be Evens, supra, wherein the majority ruling was apparently drawn from an objective assessment of the record. Defendant, on the other hand, has cited Thomas v. Atlantic Coast Line R. Co., 223 F.2d 1 (5th Cir. 1955), Alabama Great So. R. Co. v. Louisville & Nashville R. Co., 224 F.2d 1 (5th Cir. 1955), and Inland Container Corp. v. Atlantic Coast Line R. Co., 266 F.2d 857 (5th Cir. 1959), for the proposition that the Fifth Circuit is following Alabama's lead in adhering to an entirely *subjective* test. The latest of these cases, however, is some 13 years old. More importantly, none of these three

48

cases deals with trip pass provisions. Each is concerned instead with indemnity agreements in signed, commercial contracts, which are doubtful equivalents, for purposes of public policy, to disclaimers of liability printed by public carriers on the back of employee passes. Further, as quoted by the dissent in Evens (134 F.2d at 277), the Alabama Supreme Court itself has upon occasion alternatively enunciated an objective standard. See Alabama Great Southern R. Co. v. Hall, 105 Ala. 599, 17 So. 176 (1895).

It is the conclusion of this Court that the defendant is liable.

It is, accordingly,

Ordered:

The defendant, Seaboard Coast Line Railroad Company, is liable for damages sustained by plaintiff, Lillian Catheline, in an amount to be determined by this Court.